#24729-r-DG

**2009 SD 1**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JOLEEN LOUISE PIETRZAK,                       Plaintiff and Appellant,

v.

MICHAEL W. SCHROEDER,                       Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
AURORA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE TIMOTHY J. BJORKMAN
Judge

* * * *

ELIZABETH A. ROSENBAUM
Sioux City, Iowa                       Attorney for plaintiff
                                       and appellant.


DAVA A. WANTOCH
Mitchell, South Dakota                       Attorney for defendant
                                       and appellee.

* * * *

CONSIDERED ON BRIEFS
ON SEPTEMBER 29, 2008

OPINION FILED **01/07/09**

#24729

GILBERTSON, Chief Justice

[¶1.]     Mike Schroeder filed a Petition for Change of Custody of his five-year-old son, Thomas.  Custody of the child originally had been stipulated to by the parties.  Mike alleged the conduct of the child's mother, Joleen Pietrzak, required a change in custody in order to serve Thomas's best interest and welfare.  The trial court concluded a change in custody was required.  We reverse.

## FACTS

[¶2.]     The minor child in this matter, Thomas, was born to Joleen Pietrzak (Joleen) and Mike Schroeder (Mike), on October 22, 2001, after the breakup of the parties' brief relationship.  Mike, a rancher/farmer and age thirty-four at the time of trial, was focused on his farming operation and a more rural and relaxed lifestyle.  Joleen's focus was on educational goals and raising Thomas with what she considered to be proper manners in a more formal setting.  Joleen was forty years old at the time of the custody trial.

[¶3.]     Animosity developed between Jolene and Mike after the birth of Thomas concerning the manner in which Thomas would be raised.  In October 2001, shortly after the birth of Thomas, Joleen moved from Plankinton, South Dakota, to Mitchell, South Dakota.  Joleen's mother moved in with Joleen and Thomas.  Two months later, Joleen filed a petition seeking full legal custody of the child subject to reasonable visitation with Mike, and child support.  On February 12, 2002, a temporary order for custody, visitation, and support was entered by the trial court in which the parties' stipulation and agreement was incorporated into the court's order.  The stipulation provided for joint legal custody of the minor child, with

-1-

Joleen having primary custodial care subject to Mike's visitation. Mike was ordered to pay $150.00 in temporary child support beginning February 1, 2002, and half of the premiums for a health insurance policy maintained by Joleen for Thomas. The parties were ordered to provide their respective income information to a child support referee for determination of the appropriate amount of child support to be made retroactive to February 1, 2002. The order also required the parties to select a mediator for all remaining issues.

[¶4.]     Despite the court order granting Mike midweek visitation on Wednesday at Joleen's home, after a short time Mike declined the visitation claiming that the presence of Joleen's mother made it too uncomfortable. On June 26, 2002, Mike filed a motion for scheduling of visitation, a trial date, and an order requiring home studies for both parties. Mike's motion was based on his claims that the parties had been unable to mediate the matter as ordered, and Joleen was not abiding by the South Dakota Child Visitation Guidelines.[1] Mike also complained that Joleen refused to communicate with Mike on important issues regarding the welfare of the child. Mike also requested a home study, and that both parties submit to psychological testing concerning their fitness for custody and visitation.

[¶5.]     On October 25, 2002, after a hearing on the matter, a court order was issued that provided Mike with additional visitation and required him to provide for and pay the cost of transportation between Plankinton and Mitchell. All other

---

1.     Per the trial court's order of February 2, 2002, Joleen was not required to abide by the South Dakota Visitation Guidelines, but rather was required to abide by the specifics of the trial court's order as described above.

matters were ordered to be determined at full trial, or upon separate motion to the court. The parties were ordered to submit to the home study to be conducted by Renee Turbak.

[¶6.] Turbak's home study included a psychological assessment of the parties by J. Gabriel Mydland, EdD LPC, in which he noted the parents both wanted what was best for Thomas, but found it difficult to work with one another to achieve the objective. The parties' personalities were assessed and the results did not suggest any risk to Thomas when in the supervision of either parent. Mediation was recommended as a means for the parties to resolve differences and "work together, without professional advocates, to find workable solutions." Turbak's home study provided a visitation schedule for Thomas through age four, with an increase in visitation at age five. Holidays, summer vacation, and transportation were also addressed. Finally, the home study recommended a ninety-day advance notification period if either parent planned on moving more than seventy-five miles from their current residence.

[¶7.] On September 18, 2003, Joleen filed a motion requesting an order from the court implementing Turbak's recommended visitation schedule. Mike resisted the motion, claiming that Turbak's schedule did not provide him with enough visitation. Mike also complained that he wished to reduce the amount of time the minor child spent in the company of Joleen's mother, as he thought she was a bad influence over Joleen and his son.

[¶8.] On November 6, 2003, Joleen filed a motion to permit her to move with Thomas outside the seventy-five mile limitation in the stipulated custody

agreement. Joleen planned to enroll fulltime at the University of South Dakota in Vermillion, South Dakota, obtain a bachelor's degree, and eventually a post-graduate degree with the goal of becoming a professor.

[¶9.]     Mike filed a resistance to the motion and a motion for a change of primary physical custody. In it he claimed Joleen refused to increase his visitation beyond the amount provided under the South Dakota Child Visitation Guidelines per his repeated requests.

[¶10.]     On March 29, 2004, an order was entered reflecting that the parties reached another stipulated agreement. Thomas remained in Joleen's primary physical care and she was permitted to move to the Vermillion area with the minor child. In exchange, Mike obtained additional visitation. The parties were ordered to utilize Turbak to case manage the visitation schedule, and to negotiate more extensive visitation time when Thomas was not engaged in pre-school or grade school activities based on Thomas's adaptability to such extended visitation. During the time the parties were attempting to mediate issues, Joleen reported some behavioral issues with Thomas, including aggressiveness, biting, hitting, and clinginess after returning from visitation with Mike. Turbak declined to provide assistance with Thomas's behaviors due to her lack of training in child psychology. Instead, Turbak referred the parties to several child psychologists. The parties eventually selected Taryn Van Gilder, PhD, who diagnosed Thomas with adjustment disorder.

[¶11.]     On August 26, 2004, Joleen filed a petition for modification of child support for determination of an amount above the $150.00 set in the February 12,

2002, temporary order. Child support referee James D. Taylor was appointed. Mike failed to comply with the February 12, 2002, court order requiring him to submit his financial records for determination of child support obligations, and refused to comply with a subpoena for those records. Referee Taylor ordered Mike to comply; Mike failed to comply until the date of the hearing before Referee Taylor.

[¶12.] On December 13, 2004, Referee Taylor filed his report in which he pointed out inconsistencies in Mike's financial documents that made it difficult to ascertain exact income amounts, but noted a substantial amount of assets and debt in connection with his farming operation. Mike's child support obligation was set at $438.00 less a credit of $75.00 per month toward Mike's visitation travel expenses from Plankinton to Yankton. Mike was also required to pay a percentage of Thomas's unreimbursed medical expenses. A child support arrearage in the amount of $8,047.00 was ordered against Mike. Mike was ordered to pay $363.00 in child support beginning January 1, 2002, and at least an additional $75.00 per month toward the arrearage for a monthly obligation of $438.00. The parties were ordered to pay their respective attorney fees and costs.

[¶13.] On December 20, 2004, Mike objected to the Referee Taylor's report; Joleen resisted. Mike refused to pay the increased child support amount in violation of the court order, paying only the $150.00 per month and some of his share of the health insurance premiums under the temporary order dated February 12, 2002. On August 9, 2005, after consideration on briefs, the trial court entered an order approving the referee's report. The trial court also ordered Mike to pay

$500.00 toward the $3,396.22 incurred by Joleen in attorney fees and costs in the matter due to his failure to remit his financial documents per court order.

[¶14.]     On August 23, 2005, Mike filed a motion to reconsider the child support order; Joleen resisted.  On August 31, 2005, Mike filed a motion to allow continued visitation, complaining that Joleen had enrolled Thomas in a three-day preschool program that interfered with Mike's every other weekend visitation, which began on Thursday afternoons and ran through Sunday evening.  A letter from Thomas's preschool teacher was attached, which noted it would not be detrimental to Thomas to miss one day of preschool every other week.

[¶15.]     Joleen answered the motion, and reluctantly agreed to Thomas missing the day of preschool.  In her motion, Joleen asked the court to order Mike to pay the new child support amount of $363.00 and the $75.00 per month in arrearages as ordered by the court in December 2004, and the $500.00 attorney fees awarded under the court's August 9, 2005, order.

[¶16.]     On September 7, 2005, the trial court ruled from the bench denying Mike's August 23, 2005, motion for reconsideration of the child support.  On October 7, 2005, Mike appealed to this Court the August 9, 2005, order of the trial court and its denial of his objections to the referee's report.

[¶17.]     Mike then filed a Petition for Modification of Child Support on November 2, 2005.  On May 19, 2006, child support referee Mike Carter dismissed Mike's Petition for failure to contact the referee.  On June 1, 2006, the trial court entered an order accepting Referee Carter's report and recommendation, and dismissed Mike's Petition.

[¶18.] On May 5, 2006, Mike filed a second Petition for Change of Physical Custody via his new attorney requesting an order setting a trial date and for Joleen to submit to psychological testing. In his affidavit in support of the Petition, Mike testified that in the past he had had to have the court ordered visitation enforced, and that Joleen had made allegations of sexual and physical abuse against Mike.

[¶19.] On October 25, 2006, Mike's appeal before this Court of the February 2005 child support order was affirmed by one page order, concluding the appeal was without merit. This Court awarded Joleen $2,476.30 in appellate costs and attorney fees.

[¶20.] Despite failing to prosecute the Petition for Modification filed on November 2, 2005, which resulted in a dismissal, and losing his appeal before this Court on the original child support award made in February 2005, Mike filed yet another Petition for Modification of Child Support. Wanda Howey-Fox was appointed as the referee for the matter. Mike once again refused to comply with the trial court's order requiring him to submit his financial documents. Joleen filed a motion to compel, which Mike resisted via a motion to quash; Referee Howey-Fox deferred her ruling on the motions until the day of the hearing.

[¶21.] Referee Howey-Fox's report and recommendation dated June 18, 2007, provided a critical condemnation of Mike's attempts to avoid any increase to his temporary child support payment of $150.00 per month. Mike's testimony at the hearing was included in that report as: "every penny of the money that he uses to pay child support is borrowed" and is part of an operating note on the farm. Furthermore, Mike testified that he believed his income should not be used to pay

for Thomas's health insurance as Mike and Joleen's lack of financial resources should qualify Thomas for Title XIX at taxpayer expense.

[¶22.] Referee Howey-Fox's report and recommendation included a finding that Mike's net worth at the time of the hearing varied depending on whether internal bank documents or external tax documents were viewed. The report concluded Mike had $1,257,550.00 in assets and a net worth of $664,991.00. Howey-Fox wrote: "Petitioner, however, believes that the balance of the citizens of the State of South Dakota should provide the medical care for his child even though he has a net worth in excess of $664,000.00." Mike's net monthly income was determined to be $1,950.00, while Joleen's was set at $783.74 per month using minimum wage after qualifying deductions. Howey-Fox also concluded that Mike's arguments were circuitous and without any merit. No substantial change in circumstances was found. Finally, Joleen was awarded $3,702.31 in attorney fees and costs. Mike once again objected to the referee's report and recommendation, and once again was ordered by the trial court to pay monthly child support of $363.00 and $75.00 per month in arrearages.

[¶23.] On July 2, 2007, Joleen filed a Motion to Show Cause for Contempt, as Mike had not complied with the child support payments recommended by Child Support Referee Taylor on December 31, 2004, and court ordered on August 9, 2005. Joleen's motion alleged Mike's payment of child support was irregular and erratic, and calculated he owed an additional $3,570.00 in back child support from January 2005 through July 2007, plus $2,530.78 in unreimbursed medical expenses for Thomas.

[¶24.]     Mike objected, claiming he only owed arrearages of $2,067.00. He excused his failure to pay child support as follows: "Defendant is a farmer and therefore does not have a regular weekly or monthly paycheck. Because of this, he is required to wait until money comes in each month to pay child support or borrow the money from the bank." Mike's objections were rejected by the trial court, and the child support order and arrearages remained as determined by Howey-Fox. Mike finally paid his back child support the week before the custody trial, and his share of unreimbursed medical expenses on the second day of trial.

[¶25.]     At trial, Dr. Van Gilder testified that she had seen Thomas one-hundred times for counseling sessions since the age of three. She also testified that despite two years of sessions, she could not say that Thomas had improved over time. Dr. Van Gilder noted that Joleen appeared to have a difficult time hiding her dislike and distrust of Mike from Thomas, but that it was not something she was doing intentionally. Although Dr. Van Gilder testified to noticeable improvement in Joleen's behavior in the spring of 2007, that improvement, however, dissipated as the custody trial approached. She further testified that Thomas was a resilient, loving child who was highly bonded to both parents. Dr. Van Gilder testified that she did not believe Thomas would struggle to adapt to a change in custody. Dr. Van Gilder did not recommend a change in custody.

[¶26.]     Dr. Van Gilder was questioned extensively by Mike's attorney concerning the possibility that Joleen was attempting to alienate Thomas from Mike. Dr. Van Gilder testified that Thomas was exhibiting behaviors consistent with one or both parents engaging in parental alienation. She could not say

specifically who was engaging in the alienating behaviors. Dr. Van Gilder further testified that Joleen's reactions to Mike's parenting style were strong, and that Joleen had a difficult time hiding her anxiety from Thomas. Anxiety producing factors included Mike driving with Thomas in the pickup on the farm without a car seat, guns in the home and pickup, being around farm machinery, and not wanting to be separated from Thomas.

[¶27.] Dr. Van Gilder also testified to incidents of Mike's behaviors that caused anxiety for Thomas. Those included telling Thomas that Dr. Andre Clayborne, a court-appointed evaluator, was coming to their home to decide where Thomas would live and go to school. Dr. Van Gilder further testified to the effects of an incident on Thomas in which Mike shot stray dogs preying on his sheep herd while Thomas watched from the pickup truck.

[¶28.] Dr. Van Gilder testified that these types of behaviors by the parents made Thomas feel he had to choose between his parents and that was what was damaging to Thomas. In order to lessen the anxiety he felt, Thomas used "Thomas" to refer to himself at his mother's home, and "Tom" to refer to himself at his father's home.

[¶29.] Dr. Van Gilder's testimony was that both parents had engaged in the conduct, with Mike making derogatory remarks about "those damn Methodists." Joleen reportedly also made comments about Mike being a bad person or "bad guy," that Mike was a liar, and that Thomas did not live at Mike's home. The end result was that Thomas would say to his father and in counseling that Mike "was a liar," "my dad is a bad guy," without being able to articulate any reasons for his

comments. The counselor's concerns were that Thomas was in his mind being forced to choose between his parents, and that was the source of his acting out, and saying inappropriate things.

[¶30.]    Dr. Andre Clayborne, the court-appointed evaluator, testified that some behaviors and comments made by Thomas as reported in Dr. Van Gilder's treatment notes were indicative of both parents making inappropriate comments about each other in Thomas's presence. Dr. Clayborne concluded that while both parents had engaged in conduct that could be described as contact blocking or alienation, neither appeared to do so with the intent to alienate Thomas from the other parent. Dr. Clayborne also noted that Joleen had engaged in more of the negative behavior than Mike, but that no alienation from either parent had occurred. Dr. Clayborne had concerns that such conduct was responsible for Thomas's diagnoses of adjustment disorder, and made it difficult for Thomas to express his love for Mike while at Joleen's home. Dr. Clayborne also testified that protracted and repeated litigation by one parent against the other could be a sign of controlling and abusive behavior. Dr. Clayborne further testified that it would not be in Thomas's best interest to change custody from Joleen, as she had been his primary caretaker since birth and the change would be difficult for Thomas to handle. However, Dr. Clayborne did testify that a change in both parents' behavior was critical for Thomas's sake.

[¶31.]    Turbak also testified at trial. Turbak testified that she felt Joleen was at greater fault for the difficulties between the couple. Turbak testified that Joleen expressed great concern during the first custody evaluation in 2003 that Mike

would take Thomas from her. Both parents expressed concerns to Turbak regarding some of Thomas's behaviors. Turbak had doubts that these behaviors were really happening, although they were reported by both parents. Both parents were disrespectful to each other at times, instead of working together on co-parenting. Turbak testified that both parents contributed to the alienation, but believed it was more one-sided on Joleen's part due to Joleen's panic driven need to protect Thomas. However, Turbak also testified she was not qualified to give testimony on parental alienation syndrome, but that she was aware of the syndrome.

[¶32.]     Mike testified at trial concerning his lifelong Catholic faith, and that he had lived his entire life in Plankinton except while briefly attending college in Minnesota. He testified to his bond with Thomas. On cross-examination, Mike was asked why he failed to pay his delinquent child support and outstanding medical expenses until right before trial. Mike testified that he had to wait for the bank to approve the expenditure. When queried for impeachment purposes about his ability to pay off a vehicle earlier that year, the trial court sustained a relevancy objection and declined to admit an exhibit showing the large expenditure. When questioned about his less than candid responses to child support referees on his financials, Joleen's attorney was precluded from inquiring into the matter on a relevancy objection. Joleen was also precluded from admitting into evidence Referee Howey-Fox's report and recommendation. The trial court held that the child support dispute was irrelevant to the custody matter. Counsel for Joleen made an offer of proof that the inquiry and exhibit went to Mike's credibility, but the exhibit was rejected and the line of questioning was precluded.

[¶33.] Joleen testified on her own behalf to the loving relationship she had with Thomas. She testified that many of the issues with Thomas noted early in the counseling process, including bedwetting, had been eliminated. Joleen testified to several incidents where Thomas urinated in the front yard, claiming that was how they did it on the farm. Joleen testified to her hopes for Thomas's education and his upbringing, and how the differences in acceptable behavior between Mike and Joleen's households were addressed by her.

[¶34.] The trial court ruled from the bench after a one-hour recess. Prior to the ruling the court stated: "'Proverbs 3:5 says: 'Train up a child in the way he should go and when he is old, he will not depart from it.' I remember an interesting message I heard about that idea that said that it doesn't just – the Hebrew[s] isn't just referring to the idea of imposing discipline but also the idea of creating a taste for a child in lots of different aspects of life." The court also noted that it perceived Joleen had gone through a religious intensification since joining the United Methodist Church in Yankton in 2003, while Mike had a lifelong commitment to his faith and his church. These comments regarding the parties' religious practices were also included in the court's written findings of fact and conclusions of law.

[¶35.] The trial court awarded primary physical care to Mike during its comments to the parties one hour after the trial. Findings of fact and conclusions of law were filed; Joleen properly objected. The court found that both parents had adequately provided for the child's food, clothing, medical care, and other basic needs. The court noted that some concerns existed over Mike's failure to regularly pay his child support, but that because the support payments were current this was

not a serious concern. The court focused extensively on what it perceived to be Joleen's contact blocking and attempts to alienate Thomas from Mike. It concluded that Mike was more able to encourage frequent contact and a loving relationship between Thomas and Joleen, than Joleen could foster on behalf of Mike.

[¶36.]     Joleen raises the following issue on appeal which we find dispositive:

>     Whether the trial court erred when it changed primary physical custody from Joleen to Mike.

## STANDARD OF REVIEW

[¶37.]     Child custody decisions are reviewed by this Court under the abuse of discretion standard of review. *Fuerstenberg v. Fuerstenberg*, 1999 SD 35, ¶22, 591 NW2d 798, 807 (citing *Kost v. Kost*, 515 NW2d 209, 212 (SD 1994) (citing *Anderson v. Anderson*, 472 NW2d 519 (SD 1991))). The credibility of witnesses and the weight afforded to their testimony is also within the discretion of the trial court. *Id.* (citing *Kost*, 515 NW2d at 212 (citing *Mellema v. Mellema*, 407 NW2d 827, 831 (SD 1987))). "'[A]n abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence.'" *State v. Henry*, 1996 SD 108, ¶10, 554 NW2d 472, 473 (quoting *In re* A.R.P., 519 NW2d 56, 62 (SD 1994) (quoting *State v. Moriarty*, 501 NW2d 352, 355 (SD 1993); *State v. Devall*, 489 NW2d 371, 374 (SD 1992))). An abuse of discretion occurs in a child custody proceeding when the trial court's review of the traditional factors bearing on the best interests of the child is scant or incomplete. *See Fuerstenberg*, 1999 SD 35, ¶23, 591 NW2d at 807 (holding "[c]hild custody disputes should not be decided solely on a listing of faults ascribed to one parent or on the petty and often extraneous quarrels between former spouses[,]" but rather utilize "a balanced and

systemic approach" under the best interests standard).  The broad discretion of a

trial court in making child custody decisions will only be disturbed upon a finding

that the trial court abused its discretion.  *Id*. ¶22 (citing *Kost*, 515 NW2d at 212

(citing *Anderson*, 472 NW2d 519)).  As this Court recently noted:

> It is a poignant reality that when parents contest the custody of
> their children, a court must make a choice.  That choice is often
> difficult because between two loving parents there may be little
> to distinguish one over the other.  Choosing between two
> satisfactory options falls within a judge's discretion.  Thus, in
> our review of an ultimate decision on custody, we decide only
> whether the court abused its discretion.  *Fuerstenberg,* 1999 SD
> 35, ¶22, 591 NW2d at 807 (citations omitted).  Although we have
> repeatedly invoked stock definitions, the term "abuse of
> discretion" defies an easy description.  It is a fundamental error
> of judgment, a choice outside the range of permissible choices, a
> decision, which, on full consideration, is arbitrary or
> unreasonable.  *See generally Adrian v. McKinnie,* 2002 SD 10,
> ¶10, 639 NW2d 529, 533 (citations omitted).  This standard is
> the most deferential of appellate review standards, but that does
> not mean that a judge's custody decision will remain
> undisturbed.  Rather, it is a recognition that trial courts are in a
> better position to make these difficult choices because the
> parents are present in the courtroom and the judge is better able
> to assess their capabilities firsthand.

Heinen v. Heinen, 2008 SD 63, ¶10, 753 NW2d 891, 894 (quoting Arneson v.

Arneson*,* 2003 SD 125, ¶14, 670 NW2d 904, 910).

[¶38.]     The trial court's findings of fact will be upheld unless clearly

erroneous.  *Anderson*, 472 NW2d at 520 (citing SDCL 15-6-52(a); Lindley v. Lindley,

401 NW2d 732, 735 (SD 1987)).  "We will overturn the trial court's findings of fact

on appeal only when a complete review of the evidence leaves the Court with a

definite and firm conviction that a mistake has been made."  Miller v. Jacobsen,

2006 SD 33, ¶19, 714 NW2d 69, 76 (citations omitted).

## ANALYSIS AND DECISION

[¶39.]     A custody arrangement originally reached by agreement between the parties may be modified in subsequent proceedings without the necessity of showing "a substantial change in circumstances."  Hulm v. Hulm, 484 NW2d 303, 305 (SD 1992) (citing Williams v. Williams, 425 NW2d 390, 393 (SD 1988)).  "The party seeking modification must show that the best interests and welfare of the child[ ] require[ ] a change of custody."  Van Driel v. Van Driel, 525 NW2d 37, 39 (SD 1994) (citing *Williams*, 425 NW2d at 393 (citing Flint v. Flint, 334 NW2d 680 (SD 1983); Kolb v. Kolb, 324 NW2d 279 (SD 1982))).  The best interests of the child are determined by considering the child's temporal, mental, and moral welfare. *Fuerstenberg*, 1999 SD 35, ¶22, 591 NW2d at 806 (citing SDCL 25-5-10; Jopling v. Jopling, 526 NW2d 712, 717 (SD 1995)) (additional citations omitted).

[¶40.]     **Whether the trial court erred when it changed primary physical custody from Joleen to Mike.**

[¶41.]     The trial court may, but is not required to, consider the following factors in determining the best interests and welfare of the child:  parental fitness, stability, primary caretaker, child's preference, harmful parental misconduct, separating siblings, and substantial change of circumstances.  *Id.*, 1999 SD 35, ¶¶24-34, 591 NW2d at 807-10.  When considering parental fitness, a court may consider:

> (1) mental and physical health; (2) capacity and disposition to provide the child with protection, food, clothing, medical care, and other basic needs; (3) ability to give the child love, affection, guidance, education and to impart the family's religion or creed; (4) willingness to maturely encourage and provide frequent and meaningful contact between the child and the other parent; (5) commitment to prepare the child for

> responsible adulthood, as well as to insure that the child experiences a fulfilling childhood; and (6) exemplary modeling so that the child witnesses firsthand what it means to be a good parent, a loving spouse, and a responsible citizen.

*Id.* ¶24 (internal citations omitted). We focus on those that are the primary to a resolution of the issue of custody in this case.

### Ability to give the child love, affection, guidance, education and to impart the family's religion or creed.

[¶42.] The manner in which a parent encourages his or her child to practice a religion is a legitimate factor for trial courts to consider when awarding custody. *See Jopling*, 526 NW2d at 717 (finding of fact that father's unhealthy and confusing religious instruction wherein he paid children to attend church found not in children's best interest was upheld on appeal). In this case, the trial court weighed the relative commitment over time each party had for their respective faiths, and found this factor favored Mike due to his lifelong commitment to his faith. However, the trial court noted that both parties practiced their respective faiths in a manner that permitted Thomas to participate equally.

[¶43.] While we do not suggest that trial courts must weigh the number of years one parent has attended church against the other parent's attendance, we do not find an abuse of discretion by the trial court in this instance for doing so. We caution that this is but one factor in a child custody determination. We do not conclude that the trial court placed a disproportionate amount of weight on this factor.

***Willingness to maturely encourage and provide frequent and meaningful contact between the child and the other parent.***

[¶44.] The trial court focused extensively on this factor in determining its custody award. There are some serious discrepancies in the record.

[¶45.] We can only conclude based on the record that neither parent wanted to give up any time with Thomas, and would have preferred not to share visitation time with the other parent. This is unfortunately the reality of the child custody and visitation process. We do not see any successful attempts by either party in blocking access to Thomas, but certainly attempts by both parties to have as much time as possible with Thomas.

[¶46.] The record does not support Mike's claim that Joleen was purposefully attempting to alienate Thomas from Mike, as there is no evidence anywhere in the record other than Mike's allegations, that Joleen was so engaged. Dr. Van Gilder, Dr. Clayborne, and Turbak all testified that Joleen was unable to hide her fear of losing Thomas and her panic for his safety and security while at the farm. Both parties made inappropriate comments regarding their distain for the other in Thomas's presence, although the record is also clear that more comments were made at Joleen's home. Thus, we conclude that the trial court's finding of fact number twenty-nine, that Joleen had continued to attempt to alienate Thomas from Mike, is clearly erroneous.

***Capacity and disposition to provide the child with protection, food, clothing, medical care and other basic needs.***

[¶47.] The trial court's finding of fact number six was as follows: "Each parent *adequately provides* for Thomas's protection, food, clothing, medical care and

basic needs." (Emphasis added.) During the court's comments before issuing its order, it stated its belief that the capacity and disposition to provide Thomas with food and other basic needs was equally met: "I find that there have been delays in paying child support that are troubling. On the other hand, I am aware of the vicissitudes of farming and the issues of lenders and cash flow approval."

[¶48.] South Dakota Codified Law 25-7-6.1 provides in relevant part: "The parents of a child are jointly and severally obligated for the necessary maintenance, education, and support of the child in accordance with their respective means." A parent's duty to support his child is paramount, and all other debts are secondary to that duty. Jasper v. Smith, 540 NW2d 399, 404 n4 (SD 1995) (citing Brunick v. Brunick, 405 NW2d 633, 634 (SD 1987)). This Court has previously held that the self-serving testimony of a parent standing alone is insufficient without corroboration to establish a defense that a party cannot pay his child support. Sazama v. State ex rel. Muilenberg, 2007 SD 17, ¶20, 729 NW2d 335, 343 (citation omitted).

[¶49.] Mike was able to avoid the contempt proceedings scheduled at the end of the custody trial by paying his back child support in the amount of $3,570.00 the week before trial and $2,530.78 in medical expenses on day two of the trial. However, the trial court failed to give sufficient weight to Mike's two and one-half year refusal to pay the full amount of the court ordered child support. Mike, instead, equated his failure to do so and insistence on paying only $150.00 per month in child support toward Thomas's needs as a byproduct of being a cash-strapped farmer, rather than a concerted effort on his part to avoid any increase to

his temporary child support payment. There is nothing in our statutes or this Court's precedent that excuses a parent from timely paying child support due to the cash flow limitations of farming or any other profession. Nothing allows a parent to unilaterally set a lower amount for that support in defiance of a valid court order.

[¶50.] There is nothing in the record to indicate Mike adequately provided for Thomas's basic needs within his respective means. Mike's suggestion that the taxpayers of the State of South Dakota should provide his child's health insurance coverage through Title XIX is equally indicative of a parent who is unwilling to provide basic necessities for his child from his own resources.

[¶51.] There was substantial evidence that appears to have been disregarded by the trial court concerning the manner in which Mike denied Thomas these basic necessities for two and one-half years prior to the custody trial. Mike did so despite a finding by a child support referee, based in part on Mike's own documents, that Mike had a net worth of over $660,000.00 at that time.[2]

[¶52.] To suggest that a father with a net worth over $600,000.00 and cash flow limitations from his farming operation should be excused from timely paying a $363.00 monthly child support obligation is an invitation to any parent experiencing

---

2. Mike's bank records including loan applications prepared by him were the basis for that valuation set by the child support referee. When asked by his own attorney why that figure was not accurate, Mike commented that they were inflated for the purpose of obtaining loans from the bank. Mike confirms this in his brief when he stated, "However, opposing counsel was informed by the bank that the land value was inflated (by $400,000.00) due to their rewriting the operating note for Mike that year." Throughout all the subsequent proceedings, that finding of the child support referee has never been reversed.

financial difficulties (real or imagined) to refuse to comply with support obligations. Furthermore, Mike's repeated use of the legal system to deny Joleen child support payments for Thomas was not appropriate parental conduct. While Mike undoubtedly thought he was the victim of the child support referee's report and recommendation, the true victim was Thomas, whose mother struggled financially to provide Thomas with basic necessities during these endless legal battles.

[¶53.] The trial court's finding of fact on Mike's ability and willingness to provide for Thomas's basic needs was clearly in error. While we find clear error in the trial court's findings of fact, that alone is not enough. We must also determine whether the trial court made a "'fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *Heinen*, 2008 SD 63, ¶10, 753 NW2d at 894 (quoting *Arneson*, 2003 SD 125, ¶14, 670 NW2d at 910 (internal citation omitted)). The trial court's discretion is not abused when it selects between two satisfactory options, which for child custody purposes means selecting between two loving parents with little to distinguish one over the other. *See id.* (citing *Arneson*, 2003 SD 125, ¶14, 670 NW2d at 910). Thus, in our review of an ultimate decision on custody, we decide only whether the court abused its discretion. *Id.*

[¶54.] This was not a case of choosing between two equally satisfactory parents. The difference between the parents that becomes clear on review is their respective ability and willingness to provide for Thomas's basic food, shelter and clothing needs. Mike demonstrated a clear disregard for Thomas's wellbeing when he fought tooth and nail to maintain his child support obligation for Thomas at

$150.00 per month, especially in light of Joleen's modest part-time income, higher education expenses, and lack of assets. Mike used the full power of his financial resources to keep from paying an additional $213.00 per month for the basic necessities of life for his child. Instead, Mike expended at least $3,678.61 for Joleen's attorney fees which he was court ordered to pay, in addition to his own legal expenses. As previously noted, Mike finally paid his overdue child support in the amount of $3,570.00 the week before trial and $2,530.78 in medical expenses on day two of the trial. Unfortunately, the trial court did not permit inquiry into the issue of Mike's failure to timely pay his child support obligations. While the trial court did find Mike's past failure to pay his support obligation "troubling," it found it was not a serious concern.

[¶55.] On review, we consider Mike's failure to adequately support his child of grave concern. A parent who argues poverty while at the same time expending thousands of dollars to fight a $213.00 monthly increase in child support would not concern us as much if that parent had paid the child support while opposing the increase. Mike's failure to adequately provide for his child cannot be justified. "Paramount" means just that – paramount with no caveats.

## CONCLUSION

[¶56.] We do not retry the facts of this case de novo nor reweigh disputed evidence. It is not necessary or appropriate for us to do so. Mike's record of intentional failure to consider the financial needs of Thomas over those of his own in defiance of valid court ordered support speaks volumes about Mike's unwillingness to provide support for Thomas. Numerous referees, circuit judges,

and this Court have consistently rejected his pleas of poverty. "'All too often in setting child support, "[t]here are simply too few dollars to meet even the most modest standard of living . . . [and judges] are called upon to apportion poverty and its accompany misery.""' *In re* Discipline of Ortner, 2005 SD 83, ¶41, 699 NW2d 865, 878 (quoting Ochs v. Nelson, 538 NW2d 527, 531 (SD 1995) (internal citation omitted)). In numerous cases there is no alternative due to lack of parental funds. Such is not the case here as has been determined time after time in previous rounds of this endless litigation. While one does not automatically become the better parent by financial ability and willingness to outspend the other in money allocated to a child, there are certain fundamental needs a child has, which if not provided, result in dire consequences for that child's wellbeing and future. In this case, Mike failed to provide for those fundamental needs.

[¶57.] We reverse as clearly erroneous the trial court's finding of fact that these parents were equals when it came to the willingness and provision of basic life needs for Thomas. Joleen clearly is a better parent in this regard. The trial court abused its discretion when it found that the best interests and welfare of Thomas required a change in custody to Mike, the parent who had provided less than adequate support for his son and demonstrated disregard for Thomas's basic needs and wellbeing.

### APPELLATE ATTORNEY FEES

[¶58.] As authorized by SDCL 15-26A-87.3, Joleen seeks appellate attorney fees. We award the sum of $5,000.00 in appellate attorney fees.

#24729

[¶59.]     Reversed.[3]

[¶60.]     KONENKAMP, Justice, and SABERS, Retired Justice, concur.

[¶61.]     ZINTER and MEIERHENRY, Justices, dissent.

ZINTER, Justice (dissenting).

[¶62.]     I join the dissent of Justice Meierhenry. I write to point out that the majority virtually overlooks the reason why the circuit court determined a change of custody was necessary. There is no dispute that this child had endured five years of a particularly contentious child custody arrangement. There is also no dispute that this child had been unsuccessfully treated more than one hundred times over two years for a conduct disorder arising from the parental alienation syndrome existing under Joleen's custodial arrangement. Although a resolution of the child's problems was the core issue of the case, the majority devotes only three[4] of its fifty-nine paragraphs to the issue, choosing instead to devote virtually all of its analysis to the parties' ongoing disputes relating to child support. Moreover, the majority fails to even acknowledge the circuit court's *underlying* findings of fact on alienation, the

---

3.     During this appeal, Joleen filed a motion requesting Mike's brief be stricken for factual inaccuracies in reference to the trial record. While we do not grant the motion, we remind counsel of their obligation to correctly cite to the trial record and the fact that representation of a client does not grant license to expand upon and inaccurately portray the true state of the record.

4.     In those paragraphs, the Court summarily dispatches the issue by declaring there are "serious discrepancies in the record" concerning this matter. The Court, however, does not identify any evidence suggesting that Joleen was not more at fault in causing the problems. *See supra* ¶¶44-46.

-24-

prospects for change, and the unchallenged findings in which the circuit court expressly rejected Joleen's credibility on these issues.

[¶63.] I would not decide this case on the parties' history of child support litigation. In my view, we should review the testimony of the mental health professionals, the circuit court's credibility findings regarding Joleen and Mike on parental alienation, and the circuit court's underlying findings of fact regarding each parent's ability to do what was necessary to resolve the child's problems. When those issues are examined under the correct standard of review, they reflect a circuit court decision that was not clearly erroneous and one that was based on reason and the evidence.

[¶64.] Contrary to the Court's statement, the circuit court's decision was not based on Joleen's "purposefully attempting to alienate Thomas from Mike." *See supra* ¶46. On the contrary, the circuit court's findings focused on the fact that whether purposeful or not, Joleen was more responsible for the alienation, and that Joleen would be "unwilling" or "unable" to change her "very troubling" behavior if the same custodial arrangement were to continue. *See infra* ¶68. This Court's decision to focus on Mike's trial contention rather than the circuit court's findings predictably leads to the Court's result.

[¶65.] Our appellate function should be to review the evidence and reasons relied upon by the circuit court to reach its decision. "No precise formula exists for making a custody determination, but the decision should be balanced and methodical." Zepeda v. Zepeda, 2001 SD 101, ¶13, 632 NW2d 48, 53 (citing *Fuerstenberg*, 1999 SD 35, ¶23, 591 NW2d at 807). In this case, there is no dispute

that the circuit court addressed the *Fuerstenberg* factors. The primary basis[5] for the circuit court's decision was its findings that Joleen was more responsible for Thomas's parental alienation syndrome, that Joleen was unlikely or unwilling to change, and the experts' agreement that without some change in the parents' conduct, Thomas's adjustment disorder would continue as it had remained since 2002. Ultimately, the circuit court's determination was based on the finding, not addressed by this Court, that: "Father [was] better situated to model what it means to be a good parent in such areas as allowing the child to have a healthy and loving relationship with the other parent, and in not portraying the other parent in a negative light for the child."

---

5.      The Court reverses on its determination that the circuit court "failed to give sufficient weight" to, and "disregarded" Mike's delay in, making his child support payments. *See supra* ¶¶49, 51. The Court is incorrect. The circuit court expressly considered this issue, and although it found it troubling, the circuit court found that factor was outweighed by the unsuccessful treatment of the parental alienation syndrome the child was enduring as a result of the existing custody situation. Further, until today, it was well established that this Court does not reweigh the evidence to derive new factual findings. State v. Labine, 2007 SD 48, ¶18, 733 NW2d 265, 270. It must also be noted that in an attempt to support its own appellate finding, the Court relies on factual findings of a child support referee that were not admitted into evidence. *Compare* ¶¶20-22 (reciting findings of Referee Howey-Fox) *with* ¶32 (acknowledging that Howey-Fox's report and recommendation were not admitted in evidence).

With respect to litigiousness, the record is clear that both parties made repeated use of the legal system from the time of the child's birth. According to Dr. Clayborne, shortly after the birth, Joleen moved to change the child's name (to remove Mike's surname). Dr. Clayborne further indicated that Joleen had unilaterally discontinued mediation and denied visitation. In the resulting disputes, both parties utilized a number of attorneys and both parties filed numerous motions relating to custody, visitation, and support.

[¶66.]     Factually, these findings are well supported. There is no dispute that at the time of trial in 2007, Thomas was suffering from an adjustment disorder as a result of the parents' conduct in the custody situation that had been in place since February 2002, a period during which Joleen was the primary custodian. There is also no dispute that the status quo was not working. As the Court notes, Dr. Van Gilder indicated that Thomas was exhibiting behaviors consistent with one or both parents engaging in parental alienation. *Supra* ¶26. However, the Court fails to address Dr. Van Gilder's specific testimony that Thomas's presence in Joleen's home caused him to be conflicted such that he could not comfortably express his love for his father:

> I indicated to [parents] that I did not necessarily know nor was I identifying where this was coming from but that [Thomas's] behaviors were consistent with [alienation]. Some of the statements he was making villainizing his father, the misbehavior, I mean, the anxiety anticipating events and visits with his father. These types of things are kind are [sic] part and parcel of the flavor of alienation. . . . *I'm not seeing this behavior occurring at Mike's. I think part of the reason that [it] is occurring more with Joleen is because Thomas is conflicted, that he feels he cannot be comfortable about dad in mom's home.*

(Emphasis added.) Dr. Van Gilder further explained:

> [Thomas] makes statements that suggest that he doesn't love his father or he doesn't like to go to the farm. Those statements are typically made in a manner that doesn't necessarily match with how he feels. In other words, there is no anger behind it or not enough anger behind it or enough reasoning behind it. *So that implies to me that maybe these are things that he feels like he needs to say.*

Dr. Van Gilder opined that this was unhealthy for Thomas. And, as the Court concedes, Dr. Van Gilder had been counseling Thomas for over two years (starting at age three) which involved over one hundred visits, yet Thomas had not improved.

*See supra* ¶25. Dr. Van Gilder did not believe that Thomas would struggle to adapt to a change in custody. *Id.*

[¶67.]     As the Court further concedes, Renee Turbak, the home custody evaluator, indicated that Joleen was at greater fault for Thomas's alienation. *Supra* ¶31. Dr. Clayborne also agreed that parental alienation syndrome was present, and he "suspected Joleen and her mother have made derogatory comments about Mike to and around Thomas." Dr. Clayborne noted that he could not determine what Joleen's intentions were in making derogatory comments, "but it does appear that she minimizes Mike's role and does not value his input into parenting of their son. This type of attitude is the essence of [Parental Alienation Syndrome] and should be discontinued if you wish for [the child] to have a healthy relationship with both parents." Dr. Clayborne finally indicated that this conduct was probably one of the reasons why Thomas tended to be more physically violent in Joleen's home.

[¶68.]     In addressing this primary concern, the circuit court entered sixty-six findings of fact, most of which are not addressed by this Court. In those findings, the circuit court explained that whether Jolene's alienation behavior was intentional or unintentional, she was more at fault; she was not credible on this issue; her behavior was not likely to change; and therefore, a change in the existing custodial relationship was in Thomas's best interests. It must be emphasized the circuit court specifically found: that Joleen dismissed the possibility that Mike could or should play a significant role in Thomas's life; that Joleen's efforts in changing her behavior, as of September 2007, had not been successful and had brought out anxiety, anger and other negative behaviors in Thomas; that those

behaviors were more frequently displayed in Joleen's home, and Mike had few discipline problems with Thomas; that it would be most healthy for Thomas to perceive that he could freely express his love and desire to be with both parents, but it did not appear that Thomas could comfortably express his love for his father and his desire to spend time with him in Joleen's home; that Thomas portrayed his father as a villain in therapy, while it happened only occasionally with respect to his mother; that Thomas felt reluctant to talk freely about his father at his mother's house, and the anger and disdain Joleen expressed for Mike in Thomas's presence appeared to now extend to Joleen's family; that Thomas made statements without anger that he did not love his father and did not want to go to the farm, implying that these were matters Thomas felt he had to say rather than matters he actually felt; that Joleen believed Mike's parental judgment was inferior and he could not be trusted to do what was best for Thomas or to protect his safety, and therefore, Thomas was worse off having to visit his father's home; that Joleen treated Mike not like a key family member, but more like an annoying acquaintance that Thomas must see and put up with; that although both parties, at times, failed to promote a positive relationship, Joleen had consistently failed to promote such a relationship; that the record was full of negative statements by Thomas about his father indicating that they were heard in his mother's home; that Joleen and her mother had made derogatory comments about Mike to or around Thomas; that while Mike was credible on these key issues, Joleen displayed characteristics or tested positively for histrionic behavior and narcissism, and her testimony was less than credible about the issues concerning parental alienation and making decisions

about Thomas without Mike's involvement; that Joleen had strong feelings about what took place at Mike's residence and she exaggerated concerns for Thomas's physical and emotional safety; and, that although blame was not placed entirely with either parent, inappropriate behavior had occurred and Joleen was chiefly responsible for it.

[¶69.]    Thus, the circuit court specifically found:

> Mother's conduct has not demonstrated any meaningful progress in avoiding such behavior. She has continued to attempt to alienate Thomas from his father. These efforts have taken many forms, including, but not limited to: making derogatory remarks about father-and allowing others to do so-in Thomas's presence; creating an environment for Thomas where it is not okay to express his love for his father; routinely failing to include father in significant decisions about Thomas's life; making it more difficult than necessary for father and Thomas to spend time together; portraying father as a villain in Thomas's presence.

The circuit court then reiterated that the experts indicated something had to change: if "the same custodial arrangement were to continue, it is likely that mother would be either unwilling or perhaps unable to change her behavior relating to efforts to alienate Thomas from his father." The court found that there was no reason to believe that if Joleen continued to retain custody, the communication and alienation concerns were going to dissipate in as much as they had not lessened despite extensive outside help. Therefore, a change in custody was required.

[¶70.]    This Court has not identified any evidence indicating how *these underlying* findings–the ones that the circuit court actually used as the basis for its decision–were clearly erroneous. In light of these underlying findings and the record previously cited, and especially in light of the circuit court's express rejection

of Joleen's credibility on the central issue of her alienation, I cannot join an opinion that decides the case on the parties' various disputes regarding child support. For the same reason, I cannot join this Court's assumption that there was no difference between the parties in terms of their conduct towards each other and the detrimental effect it was having on Thomas; *i.e.,* that both parents had engaged in inappropriate conduct. *See supra* ¶¶45-46. Certainly, we should not begin a course of analysis that fails to consider harmful parental misconduct by rationalizing that "both parties" had some degree of involvement. *See id.* (rationalizing that both parties attempted to spend as much time as possible with the child and both parties made inappropriate comments). Ultimately, the language of the Court, reversing on the parties' history of child support litigation, reflects that it has retried the case by substituting its judgment for that of the circuit court on the relative importance of the *Fuerstenberg* factors.

[¶71.] The circuit court attempted to resolve a five-year, unworkable child custody arrangement under which Thomas was unquestionably being harmed. Because the circuit court's underlying findings were made on the express rejection of Joleen's credibility regarding this principal issue, we should continue to follow our often stated "'recognition that trial courts are in a better position to make these difficult choices because the parents are present in the courtroom and the judge is better able to assess [the situation] firsthand.'" Hogen v. Pifer, 2008 SD 96, ¶9, 757 NW2d 160, 163 (quoting Maxner v. Maxner, 2007 SD 30, ¶11, 730 NW2d 619, 622). More importantly, because the circuit court's underlying findings reflect that its decision was an attempt to change an extended, harmful child custody

arrangement, the circuit court's decision was not one exercised to "'an end or purpose not justified by, and clearly against, reason and evidence.'" *Hrachovec v. Kaarup*, 516 NW2d 309, 311 (SD 1994) (quoting *Herndon v. Herndon*, 305 NW2d 917, 918 (SD 1981)). I cannot, as does the majority, justify a continuation of this harmful situation on the belief that it is an "unfortunate[ ] . . . reality of the child custody and visitation process." *Supra* ¶45. No matter what collateral failings of the parties the majority chooses to focus upon, "our brightest beacon remains the best interests of the child." *Zepeda*, 2001 SD 101, ¶13, 632 NW2d at 53 (citation omitted). Therefore, unlike the majority, I cannot characterize the circuit court's focus on the harm that was being perpetrated on this child by the existing custody arrangement as "'a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *Hogen*, 2008 SD 96, ¶9, 757 NW2d at 163 (quoting *Maxner*, 2007 SD 30, ¶11, 730 NW2d at 622). I therefore dissent.

MEIERHENRY, Justice (dissenting).

[¶72.]    Although I agree with the majority that the trial court overlooked Mike's consistent failure to provide child support, I cannot agree that the trial court abused its discretion by changing custody. When announcing his decision in open court, Judge Bjorkman expressed his concern about Mike's delayed child support and medical payments. He indicated, "I would expect that father not repeat that, that they are paid now. And there may be some explanation for some of the delays in the past." It is hard to imagine that a parent, who consistently refuses to pay child support, has the child's best interest in mind.

[¶73.] Nevertheless, I cannot conclude based on our standard of review that Judge Bjorkman abused his discretion when he changed custody to Mike. He considered and weighed all the *Fuerstenberg* factors carefully. *See Fuerstenberg,* 1999 SD 35, ¶¶24-34, 591 NW2d at 807-10. He based this finding on what the experts said in their reports and testimonies. Joleen's attempt to alienate the child from his father weighed heavily in the custody determination. *See id.* ¶31, 591 NW2d at 809. Judge Bjorkman also noted that Joleen's psychological profile displayed "characteristics of histrionic behavior and narcissism." Additionally, he found Joleen's testimony to be:

> less credible at various points, particularly about issues concerning parental alienation, and making major decisions about Thomas without father's involvement. In those situations, she appeared reluctant to answer questions in a straightforward fashion and would often evade or fail to answer the exact questions asked to justify a position.

The court further found that Mike had made progress in promoting a positive relationship between the child and Joleen, but that Joleen continued to try to alienate the child from Mike. The court described Joleen's attempts at alienation as follows:

> These [alienation] efforts have taken many forms, including, but not limited to: making derogatory remarks about father – allowing others to do so – in [child's] presence; creating an environment for [child] where it was not okay to express his love for his father; routinely failing to include father in significant decisions about [child's] life; making it more difficult than necessary for father and [child] to spend time together; portraying father as a villain in [child's] presence.

The court's findings are based on the testimony and expert reports. I cannot agree with the majority that the findings are clearly erroneous.

[¶74.]	Even though we may have made a different custody decision based on the record, we must give deference to the trial court.  Determining the credibility of the witnesses and the weight given to their testimony falls within the discretion of the trial court.  *Id.* ¶22, 591 NW2d at 807.  Judge Bjorkman used a balanced and systematic approach, and considered and weighed all the evidence as it related to the relevant factors.  Judge Bjorkman's custody decision was not an abuse of discretion, "'exercised to an end or purpose not justified by, and clearly against reason and evidence.'"  *Henry*, 1996 SD 108, ¶10, 554 NW2d at 473 (quoting *In re A.R.P.*, 519 NW2d at 62 (quoting *Moriarty*, 501 NW2d at 355; *Devall*, 489 NW2d at 374)).

[¶75.]	I would affirm.