OPINION OF THE COURT
Richard A. Dollinger, J.
Introduction
What does “means” mean?
*779 In this matter, the court confronts a common problem for a divorced couple. The parties made a provision for their children’s undergraduate education in their separation agreement, requiring them to contribute according to “their respective means” if and when the children went to college. Now, as they begin to attend college — and the bills accrue — the parties dispute this detail of their separation agreement, specifically the definition of “means.”
Most of the facts are undisputed. In their separation agreement, the parents have joint custody of their three children. They agreed that decision making would be shared “on all matters having a significant impact on the children’s live including . . . education” and that they would finance the children’s college education “according to their respective means at the time the child attends college, after grants and scholarships have been taken into consideration.”[1] The agreement also states:
“The parents shall consult, in advance, with each other and their children concerning college education, costs, and the choice of colleges for the children, and each shall be encouraged to participate in the planning of said education. The parties shall cooperate in completing and filing any and all financial aid applications for the children in whatever manner shall maximize the children’s financial entitlement.”
In 2011, the parties’ oldest son applied, was accepted, and enrolled at Penn State University in Harrisburg, Pennsylvania. Prior to his departure, the wife moved, by order to show cause, for an allocation of the college expenses under the agreement and other relief. This court granted a portion of the requested relief, but reserved on the question of the college expense allocation. Now, the couple’s second son has applied for college and the wife seeks an allocation of those expenses as well.
The husband, in his initial response to the college expense application, contends that his wife failed to consult him on the *780 first son’s college choice. He admits that he spoke directly with his son, but in a previously submitted affidavit, contends that his son told him that his mother “would take care of it.” The husband argues that he was never informed of the child’s decision to enroll at Penn State until the wife sent him a bill for the tuition and other costs. He also argues that he is not a college graduate and does not have the means to pay what the wife requests for the child’s college education.
In 2012, the middle child applied to college, was accepted at Hofstra University and St. John’s University, and was awarded scholarships at both schools. The expenses, as estimated by the wife, total $33,000 per year for the middle child. After several conferences to discuss the allocation, the parties were unable to agree on their respective commitments to finance the cost. The wife renewed her motion, asking this court to apportion the college expenses for both sons. A hearing was held, and both parents testified.
The wife testified that she has remarried and had personal earnings of $44,672 in 2011. She receives $702 every two weeks in the form of child support for the couple’s three children, who resided with her. She states, without contradiction, that the annual cost for education at Penn State was approximately $41,000 in 2011-2012, but the son received $18,000-$20,000 in “alternative loans.” She later clarified that the first son received approximately $30,000 in loans which were cosigned by her mother (the maternal grandmother). The wife also testified that she filled out the Free Application for Federal Student Aid (FAFSA) for her son to enroll at Penn State. The wife admits that she did not pay a substantial amount for the oldest son’s first year at college — only $600 out of her own pocket for a housing deposit and an application fee. There was no evidence that she paid any additional amounts. With respect to the second son, the wife testified that he wanted to attend St. John’s University, that the university required a deposit of $700, and that she again filled out the FAFSA form. The wife added that she was unaware of any conversations between the husband and either son prior to their decisions to enroll at college. Importantly, the wife acknowledged that during this time she never considered the provisions of the separation agreement requiring her to discuss the college application process with her former husband.
During cross-examination, the wife admitted that she never discussed the FAFSA form for her older son with the husband and admitted, “we really don’t speak.” When the husband’s at *781 torney asked whether the wife had participated in a conversation with her ex-husband regarding the older child’s college choice, the wife could not recall a specific one, although she recalled a meeting where college was discussed. She could not specifically recall a conversation with the husband “over a specific dollar commitment” that the husband would make for the sons. She stated that the husband told her that he had informed his son “that he would not be able to do that [contribute to college].” The wife also testified that the husband never approached her about the children’s college education plans, even after the son had graduated from high school. During cross-examination, the wife was unwilling to commit to a specific college contribution for her sons. She testified that she would do “what I can do,” but declined to mention any specific dollar commitment. She acknowledged that she had only paid $600— total — to Penn State and that the remainder of the costs were paid through scholarships or loans. In regard to the upcoming school year, the wife testified that she was unsure how much aid her older son would receive for the 2012-2013 school year. There is no evidence that the wife ever discussed the agreed “SUNY-cap” with either of the college-bound children, or their father, prior to enrolling them in college. She did testify that while she had encouraged both children to apply to SUNY schools, neither was interested in applying.
The husband testified that he earned $56,000 in 2011. He said that he never discussed the oldest son’s college choice with his wife. He admitted he knew that his older son was applying for colleges, but he learned of that fact from his son and never discussed it with his wife prior to the decision to attend Penn State. He did acknowledge, under cross-examination, that he knew his older son was applying at the University of Maryland because his wife asked him to watch their other two sons when she took the oldest to visit the campus. He testified that he did discuss the choice of Penn State with his son and that he encouraged him to establish residency in Pennsylvania to reduce the tuition. He acknowledged that he met his wife in the summer of 2011, before his older son went to college, and that they discussed college expenses, but that occurred after his son had been accepted. He states that his wife never asked him for a commitment to pay any portion of the older son’s college expenses.
As part of the proof, the parties each introduced their own statements of net worth, their respective new spouses’ state *782 ments of net worth, and financial aid forms and other materials related to the children’s college expenses.
Analysis of the Legal Issues under the Agreement
Before analyzing this matter, the court wants to make clear its limited scope of inquiry and decision making. This court is not deciding what the parents should contribute to their children’s college education expenses. The agreement clearly indicates that both parents would contribute something if they had the means to do so. The only issues before the court are questions of contract interpretation and contractual rights: what the parents agreed they would contribute, what obligation may be enforced against either parent under the agreement, and whether either party has, to date, breached their obligations thereunder.
1. The Parties’ Obligations under the Agreement
Under New York law, parents can define their college obligations to their children in a separation agreement. (Cimons v Cimons, 53 AD3d 125, 127 [2d Dept 2008] [support for a child’s college education is not mandatory]; Bennett v McGorry, 34 AD3d 1290, 1291 [4th Dept 2006] [agreement stated that future contributions toward college expenses for children would be determined based on each party’s financial circumstances at the time and the court found that consideration of defendant’s child support obligation affected his financial circumstances and was to be considered in determining how much he had to pay toward college costs]; Milark v Meigher, 17 AD3d 844 [3d Dept 2005].) In this case, the parties agreed that they would each pay for defined college expenses. The use of the word “respective” clearly connotes that each party would make separate contributions, depending on their means.
Neither party argues the use of the word “means” is ambiguous and the court agrees that it is not. (Clark v Clark, 33 AD3d 836, 837 [2d Dept 2006] [where an agreement is clear and unambiguous on its face, the parties’ intent must be gleaned from the four corners of the agreement, and not from extrinsic evidence].) Despite the lack of ambiguity, the court is amazed by the apparent absence of legal interpretations of the phrase “respective means.” New York’s Family Court Act mentions the *783 term,[2] but no other New York statute makes reference to it, and there are no cases which discuss the definition of “respective means.”[3]
Under New York law, the tuition portion of college expenses is an add-on to basic child support. (Charap v Willett, 84 AD3d 1000, 1001 [2d Dept 2011] [describing college expenses as add-on expenses]; Matter of Levison v Trinkle, 70 AD3d 827 [2d Dept 2010] [the tuition portion of a child’s college expenses is an add-on education expense which is considered separately from the initial calculation of child support for basic need]; see Cimons at 133-134.) While the parties could have provided that the contribution to college expenses would be paid based on their pro rata share of their combined income — a method of calculating similar “add-on” expenses like payments for unreimbursed medical costs and extracurriculars — the parties here did not select that standard. (Id. at 131 [education expenses differ in that such expenses are not necessarily prorated in the same proportion or percentage as each parent’s income bears to the combined parental income].) Instead, they simply agreed that the word “means” would define their “respective” contributions.
This court has found no common law or statutory definition of the term “means.” For purposes of this proceeding, the term “means” implies that the parties would permit a review of their assets and liabilities in addition to their annual income before determining their “respective” shares of the obligation. In this context, the court interprets the term “means” to he an amount of contribution by each parent that will support the child’s college education, but not unduly overburden either parent while maintaining a reasonable lifestyle. Thus, the amount of each parent’s contribution will depend on their “respective” incomes, expenses, and assets.
*784 Before analyzing the “respective” incomes, this court notes that it does not interpret the term “means” in this agreement to include an obligation to borrow to finance the children’s college expenses. The agreement mentions “scholarships and grants” that can be “taken into consideration” in considering each party’s respective means, but the agreement makes no provision that either party borrow money to finance their child’s college education. The court is readily aware that borrowing by parents is often required to finance college costs, but in this case, the agreement makes no reference to it, or the parties’ capacity to do so. This court finds that the term “respective means” does not mandate borrowing by either party to finance their children’s college education.
2. The Husband’s Income and Assets
In 2010, the husband reported income of $51,288. In 2011, his earnings were $64,464. After paying his taxes and mandated child support, the husband would have available resources from his income as follows:
[[Image here]]
In essence, after paying his taxes and his child support obligation, the husband had $28,478 in “spendable income” in 2010 and $40,024 in 2011. In the statement of net worth submitted as an exhibit in this proceeding, the husband had monthly expenses of approximately $2,800 per month. His annual expenses total $33,600. The court would describe his expenses as modest because he includes less than $300 per month for food (including dining out) and has a meager clothing, laundry, and vacation allowance.
One item in the statement requires some additional comment. The statement includes a $400 per month retirement contribution, which seems reasonable for a 54-year-old man. In one view, this contribution is an available resource for contributing to the son’s college education. However, to allocate this sum to college expenses constitutes a determination that college *785 education expenses for the children are more important than retirement savings for the adult. The court declines to interpret the language of this agreement to require the husband — or the wife — to defer retirement savings and use the deferred resources to pay the child’s college education. There is no language in this agreement that requires — or even suggests — this sacrifice by the parent. If the court found that the retirement savings were unreasonable or excessive or that the parent already had substantial retirement accounts, the court might view the word “means” to require the parent to use retirement contributions to fund college expenses. This is not the case here.
Under these circumstances, the husband did not have any excess income, or “means,” to contribute to his oldest son’s college education in 2010. His base expenses exceeded his net available income after paying taxes and child support.
The circumstances changed in 2011, when his available net annual income increased to $40,024 (based on his substantial increase in income from $51,288 in 2010 to more than $64,000 in 2011).[4] In view of his acknowledged and declared expenses of $33,600, and assuming he continued his child support contributions for all three children, he would have approximately $6,500 (net annual income of $40,023 minus the $33,600 in annual expenses) available as excess income or “means” to contribute to his children’s college expenses.
In considering the husband’s means, this court can also look to more than his income. (Crispino v Crispino, 30 Misc 3d 1214[A], 2010 NY Slip Op 52364[U] [Sup Ct, Queens County 2010] [requirement to pay college expenses depends on “actual financial resources” and not just income].) However, based on the statement of net worth, there is little to add to the husband’s financial picture. He reports $1,000 in his checking account. His car has a net value of $3,000 and was bought used two years ago. He does possess a thrift savings plan valued at $68,000, which may seem significant, but for a 54-year-old man facing retirement sometime in the next decade, the amount is reasonable and necessary for some limited financial security. He has a $2,910 loan against the thrift plan and $3,500 in consumer credit debt. These debts are reasonable and indicate that the husband has been moderate in expenses and lifestyle since his divorce.
*786 The court also declines the invitation to require the husband to invade his retirement account — his sole source of retirement benefits — to fund his children’s college educations. As discussed earlier, the father funds the account with $400 monthly, which is reasonable and prudent. This court will not require the father to sacrifice his reasonable retirement for his children’s college education under the guise of interpreting the phrase “respective means” under the agreement.
While acknowledging his modest financial circumstances, the court is cognizant that the husband did agree to pay for college expenses. His agreement was negotiated freely during the divorce action and the court will not permit him to avoid the obligation, even if it causes him some financial distress. In the court’s calculation, the husband had no excess available resources for 2010, and thus no “means” to make any contribution to his children’s college costs. In 2011, he had excess available resources of $6,500 (the net available resources of $40,024 minus the expenses of $33,600). The court concludes that he must contribute up to $3,500 from his 2011 income to cover out-of-pocket or other costs for his son’s college education as described under the separation agreement. This amount represents more than 50% of his excess available resources for 2011 and would not require him to borrow or invade his retirement accounts.
The court notes that this analysis presumes that the husband will continue to contribute full child support for all three of his children. If the wife agreed to a reduction in child support for every dollar that the husband contributes to college room and board expenses, then his contributions to those costs would exceed $3,500. The net impact on the husband would be the same and the child support dollars would be converted into room and board payments for the children. This conversion would lower the amount of loans incurred by their children and reduce their debt obligations after graduation. However, this court will not compel the conversion of the support payments into payment of college expenses. The agreement does not require such a choice, even if prudent. This decision is best left to the parents.
Several aspects of this allocation require additional comment. This amount is only for out-of-pocket college educational costs incurred by the children. In 2011, this amount was only $600, paid by the wife. This would be the only amount subject to allocation to the father in 2011. In 2012, it appears that the *787 husband may have comparable income to what he earned in 2011. If so, the husband must contribute up to $3,500 to the college costs of both of his children. While the demands for college financing increase as his second son goes to college, the husband has no greater available resources to make a contribution. The “up-to” $3,500 contribution is all he can afford, and when the second son goes to college, his obligation remains the same. Simply put, the only “means” the husband has is the $3,500 in available net resources, and this amount remains the same regardless of how many of his children need college assistance. Translated into another application, the husband pays approximately $17,000 annually ($3,500 for college expenses and an estimated $13,500 for child support) for the support of his children and this amount is what his “means” allows him to pay and what the agreement and law requires him to pay.
In considering the husband’s net available resources, both sides acknowledge that this court can look to the income and assets of his current spouse to determine whether these resources free up “means” of the husband to pay college costs. (Domestic Relations Law § 240 [1-b] [b] [5] [iv] [D] [court can attribute income to party based on money provided by relatives and friends]; Matter of Simmons v Simmons, 48 AD3d 691 [2d Dept 2008]; Anonymous SR v Anonymous GR, 17 Misc 3d 1116[A], 2007 NY Slip Op 52030[U] [Sup Ct, Nassau County 2007] [pursuant to Domestic Relations Law § 240 (1-b) (b) (5) (iv) (D), a court may consider “money, goods, or services” provided by relatives and friends, in determining a party’s income].) The court declines to take that step here. First, the agreement provides that the contribution to the college expenses by the father will be based on “their respective means” (emphasis added). There is no indication that in utilizing the term “their” in the agreement that the parents intended that the income of a future spouse would be utilized in calculating the parties’ college contributions. In contrast to the positions taken by both parties in this case, this court reads the phrase “their respective means” to preclude the court from considering the income of any future spouse in deciding the “means” of each parent.
Second, the court declines to consider the second wife’s income, as a matter of equity. The second wife recently took a new job, receiving $42,000 annually. After she pays her payroll taxes and income taxes, she nets approximately $36,000 annually. Her statement of net worth lists $3,819.60 in monthly ex *788 penses. The court has reviewed those expenses and determines them to be reasonable and fair when considering that she has two other teenage children from a previous marriage who reside with her. She receives child support for these two children in the amount of $629 per month. This amount, when added to her net income, indicates she barely broke even with monthly expenses prior to marrying the defendant husband in this action. She also has, according to her filed statement of net worth, less than $3,000 in her banking accounts. Her pension and IRA interests, which total in excess of $60,000, were accumulated before this second marriage. The husband before this court has no marital share in any of his second wife’s assets listed on her statement of net worth and this court declines, as a matter of equity, to require her to invade her separate property to pay the college costs discussed here.
Third, given the second wife’s finances, if this court imputed her total income including her receipt of child support for her two children into the “means” available to the defendant husband in this action for purposes of determining his contribution to his children’s college costs, the court would be, in essence, “robbing Peter to pay Paul” and using her received child support to finance the college costs for her new husband’s children. For all these reasons, the court declines to consider the second wife’s resources in calculating the husband’s “means” to pay for his sons’ college expenses.
3. The Wife’s Income and Assets
Although not formally before the court on motion, the parties have asked this court to determine the wife’s contribution to college costs as well. The same net financial analysis of income and assets should apply to the mother to determine her “respective means.” Her net available income resources are as follows for 2010 and 2011:
[[Image here]]
*789 It is apparent that she had more “net available resources” than the husband had in 2010 and 2011. After receipt of child support, she had more than $51,000 in 2011 and the husband had only slightly in excess of $40,024. Of course, because of the three children in her home, she has greater expenses. In her statement of net worth, she estimates her expenses at slightly more than $4,000 per month. In the hearing, there was no questioning this amount. The court finds it reasonable and fair.
Her asset portfolio, as reflected on the statement of net worth, demonstrates that she has minimal amounts in her bank accounts, lives in a home (with her second husband) that has no equity (fair market value of $174,000 is offset by a $171,000 mortgage) and has $108,000 in her employment-related retirement and investment accounts. She carries more than $28,000 in personal consumer credit debt.
There is a suggestion that this court, in considering the wife’s means, should require her to invade the retirement accounts to contribute to her children’s college education. The court rejects that notion for the same reason expressed in rejecting any invasion of the husband’s retirement accounts. The court will not, under the guise of interpreting this agreement, require either parent to invade what are realistically minimal retirement assets for the purpose of financing their children’s college costs. Either parent could make such an invasion in the interests of their child, but given the parents’ ages (both are over 53) and the minimal amount of retirement assets, this court will not require either parent to do so. The agreement makes no reference to requiring a parent to reduce their retirement to finance the child’s education and there is no indication, based on the trial proof or any evidence before this court, that they intended such a result.
Similarly, this court declines to consider the income of the wife’s new husband in evaluating her “means” for the same reasons detailed above regarding the husband’s new wife. The parties, in their agreement, never envisioned using a second spouse’s income or assets and, to do so, in this case, would be manifestly unjust. The second husband did not testify, but his statement of net worth indicates he has monthly income of $5,642, or an annual income of $67,704. However, he claims his monthly expenses total more than $8,000, a fact not challenged by the defendant. In addition, he does not have any significant bank accounts and $41,000 in his 401(k) account. He borrowed against his life insurance policy, incurring an $11,741 debt. The *790 surrender value is $800. He has almost $15,000 in consumer debts. The second husband’s only available asset is his retirement, which barely exceeds $40,000. Given his debt and other obligations, his financial circumstances hardly justify considering them as a supplement to the wife’s financial picture.
Before reaching any conclusion regarding the wife’s means to finance college education, this court must consider that the wife’s slightly better financial picture is the result of the payment of child support. The wife has received $13,000-$14,000 in support payments in each of the last several years. Without these payments, the wife, based on her own income, has less available income than her husband (he had slightly more than $40,000 and she would have less than $39,000). In considering the wife’s contribution, this court recognizes that the child support payments are a statutory mandate for the minimal financial support of all three children and, to the extent that this court requires the wife to make a college contribution, the court may be requiring the wife to invade her child support payments. However, in considering the relative equities of both parties, even if the wife has to invade some portion of the support payments to finance her children’s college education, the ultimate beneficiary of those payments will be the couple’s children and, thus, the payment would be consistent with the spirit of the child support laws.
In this court’s view, the wife does have sufficient resources to make a contribution to her children’s college education. Her moving into a home with her new husband will produce some economies of scale in the overall family expenses. Under these circumstances, the court, under the terms of the agreement, determines that the wife has the means to afford $5,000 annually to help finance the cost of her children’s college education. As with the husband, this amount is a cumulative total for all the children and their expenses will be totaled, but their mother’s annual contribution will not exceed $5,000.
Having detailed the husband’s and wife’s relative contributions, this court further holds that if the expenses exceed $8,500 — the combined contribution required by the terms of the agreement — the parents shall only be required to contribute their respective shares. If the expenses are less than $8,500 — as appears to have been the case in 2011 when the out-of-pocket expenses totaled only $600 — these costs should be shared on a pro rata basis, with the husband paying 41% of the total and the wife paying 59%.
*791 4. Application of the Rohrs Credit
Having reached a conclusion about the parties respective contributions to the current college expenses, based on their means, the next determination is whether to apply a Rohrs credit to the husband’s contribution. Under Rohrs, the father may be entitled to reduction in his child support contributions to the extent he pays room and board for either son. (Rohrs v Rohrs, 297 AD2d 317 [2d Dept 2002]; Juhasz v Juhasz, 92 AD3d 1209 [4th Dept 2012] [a credit against child support for college expenses is not mandatory, but depends upon the facts and circumstances in the particular case, taking into account the needs of the custodial parent to maintain a household and provide certain necessaries]; Wortman v Wortman, 11 AD3d 604 [2d Dept 2004] [since the defendant is required to pay room and board, he was entitled to a credit against his child support obligation for any amounts he pays for college expenses which are duplicative of basic child support during those periods when the child may live away from home].) Here the wife must still maintain a household for the children living at home and for the older children’s college breaks and weekend visits. The oldest son has car expenses and other costs and, even though he works part time, his educational needs and other costs easily outweigh his income.[5]
The application of the Rohrs credit creates some practical accounting difficulties. The separation agreement never mentions any Rohrs credit to the husband if he pays room and board expenses. Also, there is no requirement in the agreement that the father’s $3,500 annual contribution to college costs should be allocated to tuition, expenses, or room and board. If allocated to just room and board, the husband’s “college expense” payments could reduce his regular support payments dollar for dollar. For example, if the entire $3,500 were earmarked for room and board for his oldest son, his child support obligation for all three sons would be tapered back by a similar amount under the Rohrs credit.[6] If the payments were earmarked for tuition, the husband gets no credit. In this court’s judgment, allocating *792 the husband’s entire contribution to just room and board would be unfair. At best, he should get credit only for that portion of his annual contribution which would pay the percentage of room and board as compared to the entire college expense costs as described in the agreement.[7] However, this court declines to take that approach and will, under the agreement, impose a different obligation. As calculated by the court, the husband has a Child Support Standards Act (CSSA) obligation of something in excess of $13,000 annually, an amount that may shift, from time to time, depending on his annual income. After analyzing his income and other assets, the court has determined that he can contribute an additional $3,500 annually for his children’s college costs. Therefore, his total contribution for child support and college expenses is approximately $17,000. Under the agreement and based on this court’s analysis, this amount— $17,000 — is the annual sum available for child support and college. In the future, as his older children turn 21, the husband’s total child support obligation will be reduced and, under the “available financial resources” analysis set forth above, he will have more available income to pay college expenses for the younger children. Under this analysis, as his “child support obligations” decreased, his available resources increase and his “means” under the agreement will increase as well. Similarly, the wife will have the reverse experience: as the child support dwindles, her “available financial resources” are diminished, but so should her expenses.
While recognizing the fluctuation in the couple’s assets as child support decreases, the court is not inclined to speculate on how much each parent should contribute to college in future years. Instead, the court recommends that the parents use the *793 “net available resources” analysis in the future to determine their respective contributions, with an understanding that the husband will pay more to college as his general CSSA contributions decrease and the wife would pay less. Because of these shifting circumstances, the minimal nature of the couple’s “net available resources” and the somewhat reduced contribution that this court requires the parents to contribute to the children’s college education, this court declines at this time to grant the husband a Rohrs credit for room and board paid on behalf of his two older children.[8]
In reaching this conclusion, the court, although not expressly requested to do so, must consider the question of whether either parent is required to pay college expenses after the children turn 21. The agreement makes no reference to paying college expenses beyond any child turning 21. But New York courts have increasingly held that in the absence of language in the agreement specifying an age for the cutoff of payment for college expenses, the parents, having generally agreed to pay them, must continue to pay until completion of the child’s college career, even if the child turns 21 before graduating. In Shapiro v Shapiro (91 AD3d 1094, 1095 [3d Dept 2012]), for example, the parents agreed to pay for college expenses, but there was no language in which the parents “intended to limit [the father’s] payments to the children’s first three years in college.” With no limitation set forth in the agreement, the appeals court affirmed the lower court ruling extending the father’s obligation until the child turned 22. (See also Winski v Kane, 33 AD3d 697, 698 [2d Dept 2006] [upholding obligation to pay because his “obligation to contribute was never limited in duration or made to terminate once the child reached a particular age”]; Matter of Hammill v Mayer, 66 AD3d 1196 [3d Dept 2009]; Matter of Benno v Benno, 33 AD3d 1143 [3d Dept 2006].) In this case, neither parent set any limitation on the obligation to pay college expenses. This court holds that the parties intended the college contributions to continue for a period of up to four years after the children graduate from high school.[9]
*794 5. The Wife’s Violation of the Agreement
As noted earlier, the agreement provides that the husband had shared custody and joint decision making on the children’s college choices. The agreement required the parents to consult with each other on the choice of school and the filing of financial forms. During the hearing, the wife admitted that she did not take these required steps.
In the face of an admitted violation of the agreement, the court has been asked to waive the husband’s obligations to provide for college support. The court, while not countenancing the wife’s conduct, nonetheless elects not to penalize that breach by permitting the father to avoid all his future obligations. The obligation to consult is a two-way street: the parents were each obligated to consult with the other and neither communicated with the other on the oldest son’s choice of college. In 2011, the wife actually enrolled the child in college and filled out the FAFSA forms. To that extent, she unilaterally took steps that she had no right to take in the absence of communication with the father. With respect to the second child, it also appears that the wife never consulted with the husband regarding the second son’s choice of college, but there is still a reasonable opportunity to do so. In this court’s view, the wife’s breach of the “consultation clause” in the agreement obviates the need for the father to contribute to the out-of-pocket costs incurred by the oldest son for his first year. In addition, the father was not consulted about any loans, cosigned by the student’s grandmother, and he has no obligation to remit any sums on those loans for the first year, now or in the future.
The court declines to impose any further direct penalty on the wife or pass any benefit to the husband. The court declines to reduce the father’s annual contribution for future years because of his wife’s failure to abide by the agreement in 2011. Invoking that penalty only passes the cost to the student or the grandmother. In addition, there is circumstantial evidence that the husband shares part of the failure to communicate regarding the college choices. The husband knew his son graduated from high school and that he intended to go to college, and he *795 was applying to schools out of state. He discussed options with his son, including working for a year in Pennsylvania to establish residency, and his own testimony evinces an understanding of the college application and financing process. For these reasons, other than waiving the husband’s obligations to pay for the first-year costs for his oldest son, the court declines to impose any direct penalties on either parent.
In evaluating the conduct of both parents, the court declines to award either party attorney’s fees. The wife never consulted with the husband on the college choices. The husband never inquired about the choice or sought to exercise his rights under the agreement, even though he knew that his son was going to college. They both share some blame for the fees spent in this proceeding and this court declines to award fees to either parent.
Conclusion
With respect to the future, these parents face the prospect of paying college expenses for a decade or longer. The problem in this matter is what the wife, during her trial testimony, confessed: “we [the parents] never really talk.” This matter arose because the parties, while planning for their children’s future in their separation agreement, agreed to make joint decisions about their children’s college choices. When the decisions had to be made years later, the parties, now either remarried or soon to be remarried, never communicated. Only better communication can prevent a reprise before this court as college expenses continue to add up. A frank discussion with both children about what their parents can collectively afford — one that would have already occurred if the parties were still married— might change the children’s expectations and allow them to find an affordable college education within the “means” of their parents.
The court knows that the sums detailed in this agreement will not offset the cost of the children’s increasing college education. In addition, this court has no information on what financial aid will be available to the students in the future or what, for that matter, college or governmental financial aid personnel might suggest is a reasonable contribution from each parent. The court has no proof on the tax impacts of college education on either parent. Frankly, the determination of any financial aid office in reviewing the parents’ financial status or the tax con *796 sequences to the parents is not relevant to this court. The question before this court is what they meant when they agreed to contribute “their respective means” to their children’s college expenses. If some financial aid provider or the universities determine that the parents have a greater capability to contribute, so be it. If the parties had wanted a financial aid office in a university or the federal financial aid authorities to determine their “respective means” and contributions, they could have inserted that requirement in their agreement. Instead, they used other terms and this court, based on their choice of language in their agreement, has resolved the extent of their contractual obligation to contribute to their children’s college costs.
The wife’s motion for an order setting forth the husband’s contribution to the cost of college for both sons is granted in part and denied in part. Her request for attorney’s fees is denied as is the same request of her husband. The husband’s cross motion for production of the wife’s 2011 financial information is denied as moot. The husband’s request for reimbursement of medical expenses is granted, unless otherwise paid by the wife.

. The agreement also states that there shall be a cap on such expenditures by either parent in the amount of the cost of a college education at the State University of New York (SUNY). As evidenced by this opinion, this court does not need to consider what the SUNY cap is or how it may apply to each parent or both parents in this case because neither party has the means to make a contribution up to that level. For a discussion of the SUNY cap concept, see Tishman v Bogatin (94 AD3d 621 [1st Dept 2012] [court declined to impose SUNY cap because child had attended private high school and parents had resources to pay private college cost]; Kurtz v Johnson, 54 AD3d 904 [2d Dept 2008]).

. Section 545 requires the court to “direct the parent or parents possessed of sufficient means or able to earn such means to pay ... a fair and reasonable sum according to their respective means.” (Family Ct Act § 545.) Section 415 provides the “spouse or parent of a recipient of public assistance . . . [shall] contribute a fair and reasonable sum for the support ... as may be just and appropriate in view of the needs of the petitioner and the other circumstances of the case and their respective means.”

. The court can find only one other state that utilizes this term in its statutes. (See Pietrzak v Schroeder, 2009 SD 1, 759 NW2d 734 [Sup Ct, SD 2009], citing South Dakota Codified Laws § 25-7-6.1 [which provides in relevant part: “The parents of a child are jointly and severally obligated for the necessary maintenance, education, and support of the child in accordance with their respective means”].)

. The husband’s 2011 income is more than he has received in recent years. It is the highpoint of his income potential — “the most I ever made at the postal service,” he testified. There was no evidence that he could achieve a higher income.

. The trial testimony established that the older son worked and earned almost $7,000, which was available to contribute to college costs.

. This court has routinely held that if a Rohrs credit is granted to a paying parent, the credit has a floor, which equals the presumptive amount of child support paid for the children remaining at home. The credit cannot invade the otherwise presumptive amount of child support paid for the remaining non-college-age children. For example, in this case, the credit for room and board payments for the older child could reduce the father’s child support *792 from 29% (the amount payable for three children) to no less than 25% (the presumptive amount payable for the remaining two children). The court has not found any case law authority for this floor, but the court would, in its discretion, not permit the equitable use of the Rohrs credit without it.

. Under this example, if room and board costs are 25% of the overall “education costs” as described in the parties’ agreement, then the father’s contribution will be considered to be paying 25% of the room and board costs and that amount may be deducted from his periodic child support obligation payable to his wife. For example, if the total cost is $40,000 and the room and board cost is $10,000, then 25% of the father’s contribution should be considered a contribution for room and board and the father would get a credit of $875 against his annual child support obligation. The parties could calculate the credit and apply it on an annual basis. However, this option rests solely with the parents. The court declines to mandate this complicated mathematical sharing of costs under the language of this agreement.

. The court notes that the third child is much younger and when he attends college, there will be no other unemancipated children living with the mother. Under these circumstances, application of the Rohrs credit in favor of the paying husband would be more compelling.

. This court can find only one Fourth Department precedent that deals with the question of the “implied obligation” to pay for college after age 21. In Bink v Bink (55 AD3d 1244, 1245 [4th Dept 2008]), the court held that the *794 lower court erred in directing a parent to pay child college expenses after age 21, “inasmuch as she has attained the age of 21.” The court reads Bink as preventing an after-the-fact requirement to pay expenses after the child has turned 21, a notion consistent with the Fourth Department holding in Schonour v Johnson (27 AD3d 1059 [2006]). These holdings are easily distinguished because here neither child has attained that age and the court’s holding is prospective.