#23779-a-JKK

**2007 SD 30**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

DANIEL G. MAXNER,                              Plaintiff and Appellant,

v.

RENEE M. MAXNER,                              Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JOHN J. DELANEY
Judge

* * * *

DANIEL G. MAXNER
Rapid City, South Dakota                    Pro Se appellant.

* * * *

CONSIDERED ON BRIEFS
ON JANUARY 8, 2007

OPINION FILED **03/14/07**

KONENKAMP, Justice

[¶1.] In this divorce appeal, a father questions the qualifications and opinions of a court-appointed custody evaluator. The circuit court accepted the evaluator's recommendations in its decision to award physical custody to the mother. The father also challenges the court's decisions on property division, alimony, and child support. We affirm.

## Background

[¶2.] Daniel and Renee Maxner were married on June 13, 1997. Three daughters were born to the marriage. Daniel sued for divorce in 2004. At the same time, Daniel and Renee each obtained a protection order against the other. As the trial court would later remark, "[t]here are repeated claims of violence, dominance, and abuse made by both parties and each party can point to episodes which are claimed to document or support their allegations." Both parents sought primary custody of their three children.

[¶3.] At trial, Daniel and Renee each offered evidence of the other's abuse. But the court ultimately found that "[b]oth parties know the triggers of the other and either of them can institute an altercation or uproar staged to make the other look bad or appear the aggressor." The court concluded that there was no physical match between the two. Because of Daniel's size, whether Renee was the aggressor or not, it would not "remotely resemble a fair match in any sense of the word." Essentially, the court concluded that they each married a "mate with whom they cannot live."

[¶4.]     After receiving "testimony and affidavits from many, many people," the court summarized its conclusions:  Daniel's witnesses described him as "calm, cheerful, non-aggressive, caring, loving, loyal, [and a] virtually perfect human being who suffered unendingly as a result of" Renee's actions.  His witnesses described Renee as an irrational, obsessive-compulsive woman, who fears dirt and germs, but leaves her home in a disastrous state, and who is rude and physically aggressive.  On the other hand, the court found that Renee's witnesses depicted Daniel as a dominating, raging, and abusive man who degrades Renee both in public and private.  These witnesses acknowledged that Renee has some faults, but testified that she has always been an appropriate caretaker of the children despite Daniel's claims to the contrary.  There were some witnesses with no ties to either parent.  These witnesses, the court observed, "tend to side more with the descriptions of [Daniel] by [Renee's] witnesses than the other way around."

[¶5.]     From expert opinions offered during the proceedings, the court concluded that Daniel and Renee each suffer from "personality disorders" or "markedly dysfunctional behavioral traits."  In the court's view, these psychological problems rendered their relationship "dysfunctional in many respects."  Renee has a history of personality disorders.  Yet, as the court noted, she "readily admitted these problems and works on them."  Daniel, according to the court, has a "need to dominate and control," has "difficulty in controlling angry outbursts[,] . . . has an obsession with being right and views opinions contrary to his as being wrong, ignorant, or dishonest."  The court saw "little evidence" that Daniel would accept that he has multiple problems and needs to make changes.

[¶6.] In August 2004, while the divorce was pending, the circuit court allowed Renee to move with the children to North Dakota, where her extended family resides. Daniel objected to the move. According to the court, it allowed the move "regardless of which parent would ultimately be awarded custody" and "despite [its] strong dislike of move-aways, primarily because the relationship of the parties was so dysfunctional that the [c]ourt deemed separation by a considerable distance to be essential for a peaceful and stable environment for both the adults and the children[.]"

[¶7.] In June 2005, Daniel and Renee were granted a divorce on irreconcilable differences. Daniel retained possession of the marital home, and the mutual protection orders were dismissed. In the decree, they were given joint legal custody of their three daughters, with Renee having primary physical custody in North Dakota.

[¶8.] Daniel had been the primary income provider during the marriage. He is a self-employed floor layer. Renee worked during the marriage, but only intermittently. Her primary role in the relationship was to stay home and care for the children. Considering their respective contributions to the marriage, the court ruled that an equal property division was appropriate. To balance the division, Daniel was ordered to pay Renee a lump sum of $15,406. The court also awarded Renee $150 per month in alimony for three years to allow her to improve her earning capacity while employed after the divorce.

[¶9.] Daniel appeals *pro se*. He asserts that the court erred when it (1) allowed Renee to move the children to North Dakota; (2) awarded physical custody

of the children to Renee; (3) calculated his child support obligation; (4) awarded Renee alimony; and (5) ordered a lump sum payment in the property division. Renee made no appearance in this appeal.

## Analysis and Decision

[¶10.]    Daniel proceeds under the mistaken belief that we will overturn a divorce decision if we merely disagree with a trial judge's rulings on child custody, property division, or alimony.  Among his arguments, for instance, he alleges that Renee "lied to the court."  His brief is full of assertions like these, suggesting that we should come to a different result, as if we were retrying the case from the transcript and making our own judgments about the credibility of the witnesses. His arguments expose a fundamental misunderstanding of the appeal process.  A divorce appeal constitutes a technical evaluation of a lower court decision primarily for legal error, but also for abuse of discretion and clear factual mistakes.  Arneson v. Arneson, 2003 SD 125, ¶13, 670 NW2d 904, 909 (citing Fuerstenberg v. Fuerstenberg, 1999 SD 35, ¶¶16, 35, 591 NW2d 798, 804, 810).

[¶11.]    Because of the inability of some divorcing parents to cooperate for the best interests of their children, a court must make a choice.

> That choice is often difficult because between two loving parents
> there may be little to distinguish one over the other.  Choosing
> between two satisfactory options falls within a judge's
> discretion.  Thus, in our review of an ultimate decision on
> custody, we decide only whether the court abused its discretion.
> *Fuerstenberg,* 1999 SD 35, ¶22, 591 NW2d at 807 (citations
> omitted).  Although we have repeatedly invoked stock
> definitions, the term "abuse of discretion" defies an easy
> description.  It is a fundamental error of judgment, a choice
> outside the range of permissible choices, a decision, which, on
> full consideration, is arbitrary or unreasonable. *See generally*
> Adrian v. McKinnie*, 2002 SD 10, ¶10, 639 NW2d 529, 533

(citations omitted). This standard is the most deferential of appellate review standards, but that does not mean that a judge's custody decision will remain undisturbed. Rather, it is a recognition that trial courts are in a better position to make these difficult choices because the parents are present in the courtroom and the judge is better able to assess their capabilities firsthand.

*Id.* ¶14. *See also* Zepeda v. Zepeda, 2001 SD 101, ¶13, 632 NW2d 48, 53-54 (citing Price v. Price, 2000 SD 64, ¶18, 611 NW2d 425, 430 (citations omitted)).

[¶12.]     We use the same abuse of discretion standard to review decisions on alimony and property division. *Zepeda*, 2001 SD 101, ¶20, 632 NW2d at 55 (citation omitted); Albrecht v. Albrecht, 2000 SD 54, ¶10, 609 NW2d 765, 768 (citations omitted). "When applying this standard, we do not inquire whether we would have made the same decision. Instead, we decide only whether the circuit court could reasonably reach the conclusion it did in view of the applicable law and the circumstances of the case. *Zepeda*, 2001 SD 101, ¶20, 632 NW2d at 55 (citing Olson v. Olson, 1996 SD 90, ¶9, 552 NW2d 396, 399 (citations omitted)).

### 1. Child Custody

[¶13.]     Daniel challenges the court's decision to award primary physical custody of the children to Renee. According to Daniel, the court was overly persuaded by Dr. James Simpson's opinion and failed to give greater weight to psychological evidence on Renee and the oldest daughter, as well as the testimony of Dr. Curt Hill, who conducted a psychological evaluation of Daniel. Dr. Simpson is a licensed mental health professional counselor, with a doctorate degree in counseling. He has been performing custody home studies since 1972. By order of the court, Dr. Simpson performed a complete custody evaluation and made

recommendations to the court in a twenty-page report. As Dr. Simpson explained during trial, he performed a gender-neutral custody analysis, neither favoring one parent nor the other. He took into consideration all the psychological reports. Dr. Hill, in contrast, was Daniel's personal therapist. He is a licensed psychologist, with a Ph.D. in psychology. He did not perform a custody evaluation. As he conceded on the stand, Dr. Hill took Daniel's representations at face value, without attempting to corroborate them. On the other hand, Dr. Simpson, an ostensibly neutral custody evaluator, was guided by objective procedures in custody assessments recognized in his profession.[1] Dr. Simpson interviewed both parents, visited their homes to see them interact with the children, talked with the two older daughters, consulted with the teachers, obtained background checks on both parents, and met with the grandparents.

[¶14.]     By Daniel's reckoning, Dr. Simpson was "unqualified and incompetent" in his home study and in the entire evaluation process. Daniel argues that physical custody was improperly awarded to Renee, "particularly because she has refused intensive psychotherapy, [and has] continued drinking and hurting the children." His reasons, he contends, are supported by what he presented to the court in the form of pictures and an audio tape, which he believes the court ignored or discounted.

---

1.     Dr. Simpson said he was guided by the principles and procedures from Hodges, *Interventions for Children of Divorce, Custody Access and Psychotherapy*; Gardner, *Family Evaluation in Child Custody Litigation*; Munsinger and Karlson, *Uniform Child Custody Evaluation System*.

[¶15.]     Daniel's appeal brief is selective: it describes in detail only Renee's shortcomings. Custody decisions would be less difficult if courts had only to look at the liabilities of one parent. It is not unusual for parents in a bitter custody dispute to see their cases in black and white. In their struggle to win, parents often enlist family members and supporters to take sides against the other parent. It is precisely for this reason that the circuit court appointed an independent expert to perform an objective custody analysis. Such process is not perfect, of course, for custody evaluators, like judges, can be mistaken in their judgments. But this process is superior to testimony from one parent's personal counselor, who can truly represent only that parent's side of the issue. And it is vastly superior to simply relying on the parents and their supporters for objective information to reach a proper custody decision.

[¶16.]     The circuit court found Dr. Simpson's report to be persuasive. In our review of his report and testimony, we think the court could justifiably consider his recommendations reliable. The report addressed the key concern: the best interests of the children. It was thorough, not relying on one aspect of the evidence but exploring all facets. It was logical, fact-based, and clear in supporting its recommendations. It imparted information that would not have otherwise been available to the court, such as each parent's interaction at home with the children as observed by an expert. It was balanced in assessing the personal strengths and weaknesses of the parents. It was specific, tailoring the recommendations to the individual needs of the children and their parents. Daniel's insistence that Dr.

Simpson's assessment was "unqualified and incompetent" is not borne out in the record.

[¶17.] In the end, judges, not custody evaluators, have the responsibility to make custody decisions. And although courts have considerable discretion in this area, their discretion is constrained and channeled by long-established principles. "In deciding custody disputes between parents, 'the court shall be guided by consideration of what appears to be for the best interests of the child in respect to the child's temporal and mental and moral welfare.'" *Arneson*, 2003 SD 125, ¶13, 670 NW2d at 909 (citing SDCL 25-5-45; *Zepeda*, 2001 SD 101, ¶13, 632 NW2d at 53 (citing *Fuerstenberg*, 1999 SD 35, ¶22, 591 NW2d at 806)). In *Fuerstenberg*, we set forth multiple elements to guide courts in making custody decisions. 1999 SD 35, ¶¶24-33, 591 NW2d at 807-10. These guidelines assist in reaching a "balanced and methodical" judgment. *Id.* ¶35.

[¶18.] While the court adopted the findings and recommendations of Dr. Simpson, in no way did it abdicate its responsibility for the ultimate custody decision. Dr. Simpson's report was used as part of the evidence; it was not considered the only evidence. Indeed, this is apparent from the many findings the court gathered from other facts that were never mentioned in Dr. Simpson's report or testimony. Furthermore, the court did not follow all Dr. Simpson's recommendations, deciding that longer periods with the children were appropriate for Daniel. In explaining its custody decision, the court prepared a detailed, six-page, single-spaced opinion, using the *Fuerstenberg* factors. The court found that

Dr. Simpson's report and testimony about the parties was "remarkably similar to the personalities [it] observed during the various court proceedings in this matter."

[¶19.] Ultimately, the court recognized that both parties contributed to their dysfunctional and abusive marriage. Indeed, Dr. Simpson reported to the court that the relationship between these parents was so conflicted that it was no exaggeration to say that it had reached a point of being bizarre and pathological. He found this marriage to be one of the more dysfunctional relationships he had seen. There were chemical and mental health problems, an over-involved parent, narcissistic traits, immaturity, and numerous charges and counter-charges of wrongdoing. There were even allegations made to the authorities of child physical and sexual abuse. Nothing came of these reports. All three children, in Dr. Simpson's opinion, suffered adverse effects from their parents' chronic discord.

[¶20.] In the midst of all these bitter recriminations, the court focused on which parent could best meet the needs of the children. It found that the "evidence suggests and supports that [Renee] endured much verbal and mental abuse by [Daniel]." Yet, the court noted that Renee had physically attacked Daniel. Nevertheless, "[a]bsent the use of weapons, the physical fight is not a fair fight—that is, the outcome of a fistfight, wrestling or other non-lethal combat is simply not in doubt." Under the parental fitness factor, the court concluded that each parent had their own issues that negatively affected the children. But, the court concluded, Renee is more willing overall to accept her defects and work on improvement. Daniel's self-righteous and controlling mindset, on the other hand, presented a significant barrier, in the court's view. The court noted the demeanor of

the parties in the courtroom during the trial and believed that Daniel's behavior tended to corroborate the court's assessment of the parties' characters.

[¶21.]      From our careful review of the record, we see nothing suggesting that the court reached erroneous conclusions from the evidence. The circuit court engaged in a detailed analysis of the appropriate *Fuerstenberg* factors and produced a methodical and balanced decision. We cannot say that the court abused its discretion in awarding primary physical custody to Renee.

### 2. Mother's Move to North Dakota

[¶22.]      Daniel also insists that the circuit court was wrong to allow Renee to move to North Dakota with the children. According to Daniel, Renee made statements that "misled and manipulate[d]" the court in an attempt to have the court allow her to move. He contends that because she has mental health issues he fears for the children's safety. Moreover, according to Daniel, the move should not have been permitted because it distances his children from him and causes an increase in hardship, travel costs, and driving hazards during winter months.[2]

[¶23.]      We review a court's decision to allow a parent to move the children out of the jurisdiction under the abuse of discretion standard. Ducheneaux v. Ducheneaux, 427 NW2d 122, 123 (SD 1988) (citing *Matter of* Ehlen, 303 NW2d 808, 810 (SD 1981)). Our Legislature has declared that "[a] parent entitled to the custody of a child has the right to change his residence, subject to the power of the circuit court to restrain a removal which would prejudice the rights or welfare of the

---

2.      These same issues would exist regardless of which parent received physical custody, as long as one parent lived out of state.

child." SDCL 25-5-13. We recognize that removing a child from the jurisdiction is "generally against policy." *Ducheneaux,* 427 NW2d at 123. Here, the court determined that the move is in the best interests of the children. It allowed the move "despite [its] strong dislike of move-aways, primarily because the relationship of the parties was so dysfunctional that [it] deemed separation by a considerable distance to be essential for a peaceful and stable environment for both the adults and the children." Moreover, Renee's extended family lives in North Dakota and a support system exists there for her. Although Daniel claims to be overly burdened because of the distance he is required to travel, he and Renee split the distance of travel for exchanging the children. We find no abuse of discretion.

### 3. Child Support

[¶24.] Daniel challenges the court's calculation of his child support obligation asserting that it was not completed in accordance with South Dakota law. Specifically, he claims that the court should not have averaged his income using the 2001, 2002, and 2003 income tax returns, but should have used 2004, as it better reflected his income at the time of the divorce. He also asserts that the court ignored the requirements of SDCL 25-7-6.2 and set his obligation too high.

[¶25.] In determining a monthly net income, a court is permitted, in appropriate cases, to use an average over a period of years. Hendricksen v. Harris, 1999 SD 130, ¶12, 600 NW2d 180, 182-83 (citing Ochs v. Nelson, 538 NW2d 527, 529 (SD 1995)). Daniel is self employed and does not receive a set monthly income. Therefore, the court used an average of years to gain an idea of Daniel's actual income. Although he claims that 2004 accurately reflects his earning capacity, his

Edinger v. Edinger, 2006 SD 103, ¶16, 724 NW2d 852, 857 (using a tax return that better reflected average income).

[¶26.] The court also did not err when it calculated Daniel's child support obligation. Daniel's monthly net income is $1601.95, which with three children creates an obligation of $605 per month. *See* SDCL 25-7-6.2. This amount is in the bolded area of the table. *Id.* Therefore, the court must compare $605 to Daniel's proportionate share of the obligation in consideration of both parents' income. *See id.* Daniel's proportionate share is $598. Because $598 is less than $605, the court properly used Daniel's proportionate share obligation rather than his obligation determined solely by his income.[3] *See id.*

### 4. Alimony and Property Division

[¶27.] Daniel claims the court's property division and award of alimony left him to do nothing but sell the house and declare bankruptcy. He contends that "there is no sufficient reason to award Renee one half of everything" because they have "been married for only seven years and [he] purchased the home several years before" the marriage. He also challenges the court's requirement that he pay Renee a lump sum payment of $15,406. The court considered the parties' relative roles in

---

3. In a correction, the circuit court later reduced the child support from $598 to $542.25.

the marriage and concluded that an equal split was warranted. Based on our review, the court did not abuse its discretion.

[¶28.] We also conclude that the court's alimony award was not an abuse of discretion. The court analyzed the length of the marriage, the parties' earning capacities, their ages, health and physical conditions, social standing and relative fault. *See Zepeda*, 2001 SD 101, ¶21, 632 NW2d at 55-56 (citing *Price*, 2000 SD 64, ¶61, 611 NW2d at 437 (citations omitted)). It recognized that because Renee had not been working, but had been home with the children as the primary caretaker, an alimony award for three years would help her improve her earning capacity. It also found that Daniel "is steadily employed, [and] capable of earning considerably more money" than Renee. And even though both parties contributed to the breakup of the marriage, the court concluded that the "fault lies more heavily with" Daniel.

[¶29.] Affirmed.

[¶30.] GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.