#24760-a-SLZ

**2008 SD 96**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

KIRK HOGEN,                                           Plaintiff and Appellee,

    v.

ELIZABETH (HOGEN) PIFER                              Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
CLAY COUNTY, SOUTH DAKOTA

* * * *

HONORABLE STEVEN R. JENSEN
Judge

* * * *

MELISSA B. NICHOLSON of
Nicholson & Nicholson                    Attorneys for plaintiff
Sioux Falls, South Dakota                and appellee.

KAREN L. CREW
MICHAEL B. CREW of
Crew and Crew                            Attorneys for defendant
Sioux Falls, South Dakota                and appellant.

* * * *

CONSIDERED ON BRIEFS
ON AUGUST 26, 2008

OPINION FILED **10/08/08**

#24760

ZINTER, Justice

[¶1.] Approximately one year after her divorce, Elizabeth Pifer moved the circuit court to relocate the parties' minor son from South Dakota to Illinois. The circuit court denied Pifer's motion, and Pifer appeals. We affirm.

I

[¶2.] Kirk Hogen and Elizabeth (Hogen) Pifer entered into a stipulation and agreement for divorce on May 19, 2006. At the time, both parties lived in Vermillion. Under the divorce decree, they shared joint legal custody of their son Jake (age eleven at the time). Pifer had primary physical custody, and Hogen had rights of visitation. Hogen's visitation included two evenings during the week and alternating weekends. Every other mid-week visitation included an overnight. Neither party was prohibited from moving more than a *de minimus* distance from the Vermillion area after the divorce.

[¶3.] One year after the divorce, Pifer sent Hogen a notice of intent to relocate Jake to Channahon, Illinois so that she could live with her boyfriend Paul Pifer, whom she planned to marry that summer. Hogen objected and moved for a hearing on the matter. Thereafter, Pifer formally moved to allow the relocation.

[¶4.] The parties retained Dr. Andre Clayborne to conduct an evaluation[1] of Pifer's request to relocate. Before Dr. Clayborne's evaluation was completed in October of 2007, Pifer married Paul Pifer. In his evaluation, Dr. Clayborne opined that Jake was currently living in the best arrangement in Vermillion, an

---

1. Dr. Clayborne had performed the initial home study for the divorce.

-1-

arrangement that involved maximum contact with both parents. Dr. Clayborne also opined that he "was not convinced that the move would serve Jake's best interest in any way. It would be [my] opinion that under the given circumstances that Jake is thriving in his current environment." Dr. Clayborne did, however, note that because of Jake's close emotional connection to Pifer, if Pifer were to move to Illinois, it would be in Jake's best interest to move with her.

[¶5.] A court trial was held on October 25-26, 2007. At trial, Dr. Clayborne focused on Pifer and Jake's close relationship, testifying that Hogen and Jake "have a good relationship as well, but . . . the emotional connection is with mom." The circuit court acknowledged Dr. Clayborne's evaluation and trial testimony favoring Pifer. Although the court indicated it did "not have any real quarrel with Dr. Clayborne's decision in terms of emotional attachment," the court observed that Dr. Clayborne downplayed the attachment Jake had with his father. The court further observed that it couldn't "say anything negative about either parent," and found that "[i]t's very clear both parties are fit."

[¶6.] Regarding Jake (who had turned thirteen the day before trial), the court found that he was "well-adjusted," did "well in school and otherwise," and "appear[ed] to have a good handle on life." The court noted that Jake was in seventh grade, was an "A" student and "star athlete," had friends and extended family in Vermillion, and was "very popular." After further noting that Jake had grown up in Vermillion, the court found that moving to Illinois "would be a significant adjustment" and would "disrupt" his stability. The circuit court was also concerned about visitation problems for Hogen if Jake moved. The court explained

that Hogen worked as a golf professional, and summer was his busy season requiring approximately sixty-hour work weeks. Pifer, on the other hand, had two and one-half months off during the summer. The court opined that Pifer's proposed move to Illinois, which required summer visitation with Hogen in Vermillion, would be counter-intuitive because Hogen would be spending so much visitation time working.

[¶7.] The court also noted that although Jake expressed a preference to move, he had not spent any meaningful time in Illinois. Further, following its own personal interview of Jake, the court found that Jake did not have a reason for his preference. The court found that "[Jake's] preference relat[ed] more to his desire to please his mother than his own interests in the case."

[¶8.] The court ultimately found that based on Jake's age, his involvement in school, his connection with the community, and his relationship with Hogen, stability favored Jake living in Vermillion. The court ultimately concluded that it was not in Jake's best interest to move to Illinois.

II

[¶9.] SDCL 25-5-13 provides that "[a] parent entitled to the custody of a child has the right to change his residence, subject to the power of the circuit court to restrain a removal which would prejudice the rights or welfare of the child." This statute requires the circuit court to determine whether it is in the best interest of the child to relocate out of state. Maxner v. Maxner, 2007 SD 30, ¶23, 730 NW2d 619, 625. In our review of a custody decision, "we decide only whether the court abused its discretion." Id. ¶11, 730 NW2d at 622. Abuse of discretion "is

a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Id.* This standard does not mean that a trial court's custody decision remains inviolate. "Rather, it is a recognition that trial courts are in a better position to make these difficult choices because the parents are present in the courtroom and the judge is better able to assess [the situation] firsthand." *Id.*

### III

[¶10.]     At the hearing, Pifer testified that she would not relocate to Illinois if the court would not allow Jake to move with her.  Pifer first argues that the circuit court improperly focused on this testimony in denying her motion to relocate.  She contends that the circuit court's consideration of her willingness to stay in Vermillion isolated the "maximum continuing contact" factor to the exclusion of other relevant factors.  She also contends that affirming the circuit court's decision would result in no out-of-state relocations.  We disagree with both contentions.

[¶11.]     In *Zepeda v. Zepeda*, this Court rejected reliance on a single factor in favor of a balanced consideration of multiple factors when making a custody determination.  2001 SD 101, ¶15, 632 NW2d 48, 54 (citing Fuerstenberg v. Fuerstenberg, 1999 SD 35, ¶31, 591 NW2d 798, 809).  Those factors generally include fitness, stability, primary caretaker, child's preference, harmful parental misconduct, separating siblings, and substantial change in circumstances. *Fuerstenberg*, ¶¶24-33, 591 NW2d at 807-10.

[¶12.]     Contrary to Pifer's argument, this case is unlike *Fortin v. Fortin*, 500 NW2d 229 (SD 1993).  In that case the circuit court "ignore[d] several factors" and

prohibited an out-of-state relocation "for the sole reason that the move would disrupt the noncustodial father's visitation with and influence over his son[.]" *Id.* at 232. In this case, the circuit court issued seventy-three findings of fact and fourteen conclusions of law reflecting a balanced consideration of all relevant factors. The court's consideration of Pifer's willingness to stay in Vermillion was mentioned only once, and the court did not focus on "maximum continuing contact."[2] Instead, the court considered a number of factors including Jake's age, his relationship with his father, his involvement in the school and community, his friends and extended family in Vermillion, and the finding that a move to Illinois would be a significant adjustment disrupting his stability. Therefore, the circuit court did not erroneously focus solely on a custody arrangement that would ensure maximum contact with both parents.

[¶13.] For the same reason, the circuit court's decision is no precedent for a blanket rule prohibiting all out-of-state relocations. On the contrary, the court's use of a balanced approach considering a number of factors cannot be precedent for a *per se* rule. Furthermore, the circuit court specifically noted that this was the unusual case where both parents had spent considerable effort successfully co-parenting Jake, which enabled Jake to thrive and succeed in the Vermillion community.

[¶14.] Pifer also argues there was insufficient evidence for the circuit court to deny her motion to relocate. Pifer argues that Dr. Clayborne opined that it would

---

2. In fact, the circuit court never utilized that phrase in either its findings or conclusions of law.

be in Jake's best interest to move with her to Illinois, and therefore "there is no evidence upon which the [circuit] court could have concluded that it was in Jake's best interests to remain in Vermillion with his father if his mother did relocate." Dr. Clayborne, however, indicated in his October 2007 follow-up evaluation that it would not be in Jake's best interests to move:

> On the issue of moving, it is apparent that the move is being made to benefit Liz and Paul. [I] was not convinced that the move would serve Jake's best interest in any way. It would be [my] opinion that under the given circumstances that Jake is thriving in his current environment. He is a straight "A" student, a star athlete, has many friends, and is much respected in the Vermillion community. Currently, he has access to both of his parents and is able to see them as often as he likes. From [my] perspective for Jake, he is currently in the best living arrangement.

Although Dr. Clayborne's trial testimony was more favorable to Pifer, he essentially held to his original opinion, only slightly favoring Pifer *if* the move was made. Dr. Clayborne testified:

> You know, again I struggled with that particular concept. . . . I think I made the statement inside of the report, realistically if both parents are staying in town or were to stay in town, this is probably the *ideal situation* for him. *The move I don't necessarily see as being in his best interest per se*, but again weighing that – between that and the emotional connection with his mom, *I guess I would err on the side of placing him with his mom.*

(Emphasis added).

[¶15.]    Considering all of Dr. Clayborne's opinions together with the circuit court's considerations, there was substantial evidence to support the court's decision. Further, this is a case in which the court recognized that both parents had done an excellent job of co-parenting for the benefit of their son. As we stated in

*Maxner,* "'[c]hoosing between two satisfactory options falls within a judge's discretion.'" 2007 SD 30, ¶11, 730 NW2d at 622 (quoting Arneson v. Arneson, 2003 SD 125, ¶14, 670 NW2d 904, 910). This is such a case.

[¶16.] Hogen submitted a motion for appellate attorney fees. The motion is accompanied by an itemized and verified statement of the costs incurred pursuant to SDCL 15-26A-87.3. An award of appellate attorney fees is permissible if they are accompanied by a verified, itemized statement of the legal services rendered and if the attorney fees are otherwise allowable. *Id.* Attorney fees are allowable in domestic relation cases, "consider[ing] the property owned by each party, the relative incomes, the liquidity of the assets and whether either party unreasonably increased the time spent on the case." Barnes v. Matzner, 2003 SD 42, ¶24, 661 NW2d 372, 379 (additional citation omitted). These financial factors do not appear in this record, and there does not appear to be evidence that either party has proceeded unreasonably. We also "examine the fee request[ ] from the perspective of whether the party's appellate arguments carried any merit." *Arneson*, 2003 SD 125, ¶38, 670 NW2d at 917. Considering the closeness of this case involving two fit parents, we deny Hogen's motion.

[¶17.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and MEIERHENRY, Justices, concur.