#26494-a-LSW

**2013 S.D. 81**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

ELIZABETH ANN BROSNAN
n/k/a ELIZABETH A. AUDISS,                     Plaintiff and Appellee,

              v.

JESSE JOHN BROSNAN,                           Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
UNION COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CHERYLE W. GERING
Judge

* * * *

ELIZABETH ROSENBAUM
Sioux City, Iowa                              Attorney for plaintiff
                                              and appellee.


ALEX HAGEN of
Cadwell, Sanford, Deibert
  & Garry, LLP
Sioux Falls, South Dakota                     Attorneys for defendant
                                              and appellant.



* * * *

ARGUED ON OCTOBER 1, 2013

OPINION FILED **11/20/13**

#26494

WILBUR, Justice

[¶1.]        The circuit court granted a motion to relocate brought by Elizabeth (Brosnan) Audiss (Elizabeth).  Jesse Brosnan (Jesse) appeals.  We affirm.

## FACTS AND PROCEDURAL BACKGROUND

[¶2.]        Jesse and Elizabeth were married in 2003.  From this marriage, two children were born: J.J.B., a son, and J.E.B., a daughter.

[¶3.]        The couple divorced in 2009.  Judge Arthur L. Rusch awarded the divorce to Elizabeth on the grounds of extreme cruelty based on incidences of domestic violence committed by Jesse.  Because of the couple's inability to work together to raise the children, Judge Rusch awarded sole legal custody of the children to Elizabeth.  Judge Rusch also awarded primary physical custody of the children to Elizabeth and granted visitation to Jesse.  The divorce decree did not contain a moving restriction.

[¶4.]        Both of the children had issues requiring therapy.  J.J.B. was diagnosed with attention deficit hyperactivity disorder (ADHD) and oppositional defiance disorder.  Prior to the divorce, J.J.B. had been seen by many medical providers and had been hospitalized in a children's psychiatric ward.  Jesse often disagreed with the medical professionals, who prescribed medication to treat J.J.B.'s ADHD.[1]  Additionally, J.E.B. was diagnosed with generalized anxiety disorder.

---

1.    The circuit court found that Jesse "vehemently resisted [J.J.B.'s] diagnosis and treatment throughout this case and continues to do so today, as evidenced by his refusal to take [J.J.B.'s] medication when he picks up [J.J.B.] from school as recently as March 6, 2012."

-1-

[¶5.]        In April 2010, Elizabeth began a relationship with Jonnathan Audiss (Jonnathan), whom Elizabeth had met when they were both in junior high school in Martin, South Dakota. Jonnathan moved to Sioux City, Iowa, to live with Elizabeth. While in Sioux City, Jonnathan worked in the construction industry as a construction manager.

[¶6.]        Elizabeth and Jonnathan were married on February 12, 2011.[2] Approximately one year after the marriage, Jonnathan was terminated from his job. After briefly looking for a job in the Sioux City area, Jonnathan accepted a position at a construction equipment rental company, which was a short distance from a house that Jonnathan owned in Murietta, California.

[¶7.]        In mid-February 2012, Elizabeth sent Jesse a notice of intent to relocate to California and indicated that she, Jonnathan, and the children intended to move to California in March 2012. On February 29, 2012, Elizabeth sent Jesse an email and indicated that she intended to move "in less than 2 weeks." In response, Jesse filed an application for a temporary restraining order and preliminary injunction seeking to enjoin Elizabeth's departure.

[¶8.]        A two-day hearing on Elizabeth's motion to relocate was held in April 2012. The circuit court issued a memorandum decision in May 2012 and provided the factors it believed to be critical in determining whether Elizabeth had met her burden in establishing that the relocation request was in the best interests of the children. The circuit court determined that it was in the best interests of the

---

2.     In late January 2011, Jonnathan moved out of the house in response to Elizabeth's ultimatum about marriage.

children to move to California, but delayed its final decision because it was concerned with whether Jonnathan could financially provide for the family in California. As a result, the circuit court required Elizabeth to submit evidence of two months of income showing that Jonnathan was earning what he had testified he expected to earn in California. At a second hearing in July 2012, Elizabeth presented evidence that Jonnathan had received the anticipated income from his employer in California.

[¶9.] In August 2012, the circuit court entered its findings of fact and conclusions of law, incorporating both the May 2012 memorandum decision and the evidence from the hearing in July 2012, and determined that the relocation was in the best interests of the children. The circuit court also concluded that both parties were reasonable in their respective positions regarding the relocation motion and neither party unreasonably increased the time spent on the case. The circuit court awarded Elizabeth $3,500 in attorney fees.

[¶10.] Jesse presents the following issues in this appeal:

    I.    Whether the circuit court erred in (i) failing to exclude exhibits and testimony that related back to pre-divorce events, and (ii) relying on that inadmissible evidence to re-litigate issues previously adjudicated by Judge Rusch.

    II.    Whether the circuit court abused its discretion in granting Elizabeth's motion to relocate to California with the children.

    III.    Whether the circuit court erred in ordering Jesse to pay Elizabeth's attorney fees arising from Elizabeth's relocation motion.

Additionally, Elizabeth and Jesse filed motions with this Court each requesting appellate attorney fees pursuant to SDCL 15-26A-87.3. The parties also request their respective costs.

## STANDARD OF REVIEW

[¶11.] "A court's evidentiary rulings are presumed correct" and such rulings will not be reversed on appeal unless there is a clear abuse of discretion. *Papke v. Harbert*, 2007 S.D. 87, ¶ 13, 738 N.W.2d 510, 515. Additionally, we review a circuit court's grant or denial of a request to relocate the principal residence of a child for an abuse of discretion. *See Ducheneaux v. Ducheneaux*, 427 N.W.2d 122, 123 (S.D. 1988). An "[a]buse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *Hogen v. Pifer*, 2008 S.D. 96, ¶ 9, 757 N.W.2d 160, 163 (quoting *Maxner v. Maxner*, 2007 S.D. 30, ¶ 11, 730 N.W.2d 619, 622). This level of review "is a recognition that trial courts are in a better position to make these difficult choices because the parents are present in the courtroom and the judge is better able to assess the situation firsthand." *Id.*

[¶12.] "We review the circuit court's construction of statutes de novo." *People ex rel. J.L.*, 2011 S.D. 36, ¶ 4, 800 N.W.2d 720, 722. This Court also reviews the circuit court's grant or denial of a request for costs and attorney fees under the abuse of discretion standard of review. *Schieffer v. Schieffer*, 2013 S.D. 11, ¶ 13, 826 N.W.2d 627, 633.

[¶13.] We will uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* ¶ 15. "[T]his Court 'will overturn the trial court's findings of

#26494

fact on appeal only when a complete review of the evidence leaves this Court with a definite and firm conviction that a mistake has been made.'" *Id.* (quoting *Kreps v. Kreps*, 2010 S.D. 12, ¶ 25, 778 N.W.2d 835, 843). We "give[ ] due regard to the trial court's opportunity 'to judge the credibility of witnesses and to weigh their testimony.'" *Id.* (quoting *Walker v. Walker*, 2006 S.D. 68, ¶ 11, 720 N.W.2d 67, 70-71).

## DECISION

[¶14.] **I.** **Whether the circuit court erred in (i) failing to exclude exhibits and testimony that related back to pre-divorce events, and (ii) relying on that inadmissible evidence to re-litigate issues previously adjudicated by Judge Rusch.**

[¶15.] Jesse asserts that the circuit court committed prejudicial error by admitting and relying on evidence that he contends should have been excluded. He contends that much of the testimony and evidence, which Jesse objected to at the hearing, was remote—stemming from events occurring in 2008 and 2009. Jesse argues that this evidence included hearsay testimony from Elizabeth regarding how medical providers and educators viewed Jesse and exhibits that were not relevant to the relocation to California. Additionally, Jesse challenges the testimony and exhibits on the basis of the principles of res judicata. He asserts that the testimony and exhibits have already been adjudicated by Judge Rusch in the divorce trial and that the circuit court's consideration of such evidence in its findings is an abuse of discretion as a matter of law.

[¶16.] At the relocation hearing, the parties disputed whether the relocation motion warranted the presentation of evidence stemming from events occurring in

-5-

2008 and 2009. In ruling on an objection from Jesse's counsel, the circuit court noted:

> I think it would be best to approach it from the court being presented with evidence as to what the current custody arrangement is, and the court at this point won't allow testimony going back in time to explain that. It may — there may be an opening of the door at some point in the future to it, but for now I will sustain the objection pending a determination as to whether it's warranted in the future, that further explanation as to why custody is the way it is.
> . . . .
> Again, the door may be opened later, but let's focus on what was established in the divorce decree and any subsequent orders and then what the current situation is. Let's focus upon that at this time.

As to testimony concerning J.J.B.'s past medical treatment and what precipitated the need for such treatment, the circuit court remarked:

> The court will allow a brief recitation of the circumstances that led to the psych — psychiatric care of [J.J.B.], because the court believes that it's necessary to have that background to understand his current treatment plan as well as a future treatment plan; but the court would again emphasize that that background information should be presented, but the focus should be on the current and future treatment of [J.J.B.]

[¶17.]     From a review of the record, it is apparent that the circuit court considered the evidence regarding J.J.B.'s medical condition in order to familiarize itself with J.J.B.'s medical background to understand his current treatment plan as well as a future treatment plan. The record reveals that J.J.B.'s current and future treatment plans were a factor the court considered in determining whether relocation was in the children's best interests. In analyzing the applicable factors in its relocation determination, the circuit court found that it "[was] satisfied from the evidence presented that [J.J.B.'s] ADHD [was] sufficiently stabilized that he will be

able to make the move to California and that Elizabeth [would] insure that the structure [was] in place so that [J.J.B.'s] ADHD condition [would] remain[ ] stable."

[¶18.] The circuit court did not relitigate matters from the divorce proceedings when it reviewed the evidence and considered whether it was in the children's best interests to relocate to California. Rather, the evidence provided the circuit court J.J.B.'s medical background in order for the court to understand the child's current and future treatment plans. In response to Elizabeth's counsel's question regarding J.J.B.'s past medical diagnosis for post-traumatic stress disorder and Jesse's counsel's objection, the circuit court overruled the objection and stated that it believed that there was "a need for some background. The court [did] not intend to relitigate the issue [concerning J.J.B.'s medical diagnosis]. The court would understand the question to be simply what the diagnosis of [J.J.B.] was[.]" Because the circuit court used this evidence as background information in order to help it understand J.J.B.'s current and future medical treatment for purposes of its relocation determination and did not engage in a relitigation of these issues, the circuit court's evidentiary rulings as to this evidence were not an abuse of discretion.

[¶19.] **II. Whether the circuit court abused its discretion in granting Elizabeth's motion to relocate to California with the children.**

[¶20.] SDCL 25-5-13 provides that "[a] parent entitled to the custody of a child has the right to change his residence, subject to the power of the circuit court to restrain a removal which would prejudice the rights or welfare of the child." "This statute requires the circuit court to determine whether it is in the best

interest of the child to relocate out of state." *Hogen*, 2008 S.D. 96, ¶ 9, 757 N.W.2d at 163. In examining the best interests of the child, the circuit court may consider the following factors: "fitness, stability, primary caretaker, child's preference, harmful parental misconduct, separating siblings, and substantial change in circumstances." *Id.* ¶ 11, 757 N.W.2d at 164. These factors assist the circuit court in reaching a "balanced and methodical" decision. *Maxner*, 2007 S.D. 30, ¶ 17, 730 N.W.2d at 624 (quoting *Fuerstenberg v. Fuerstenberg*, 1999 S.D. 35, ¶ 35, 591 N.W.2d 798, 810). Additionally, "[w]e have consistently stated that these factors are to be viewed as guideposts for trial courts, thus, 'a court is not bound to make a specific finding in each category; indeed, certain elements may have no application in some cases, and for other cases there may be additional relevant considerations. In the end, our brightest beacon remains the best interests of the child.'" *Beaulieu v. Birdsbill*, 2012 S.D. 45, ¶ 10, 815 N.W.2d 569, 572 (quoting *Zepeda v. Zepeda*, 2001 S.D. 101, ¶ 13, 632 N.W.2d 48, 53).

[¶21.]     In conducting its analysis, the circuit court thoroughly examined the relevant factors in determining that relocation was in the best interests of the children. The circuit court found that Elizabeth had been the children's primary caretaker since birth. The circuit court also found that "Elizabeth was awarded sole legal and physical custody of the children in the divorce, and that Jesse abused both Elizabeth and [J.J.B.] during the marriage[.]" Further, the court found that Elizabeth was a fit parent and had provided stability for the children since birth. By contrast, the circuit court found that, even though Jesse had improved his parenting skills and his relationships with the children since the divorce, he had to

demonstrate a longer history of appropriate behaviors in order for the circuit court to conclude that he was a fit parent.

***Parental Fitness***

[¶22.]      Jesse challenges the circuit court's consideration of the fitness factor and contends that the circuit court placed undue weight upon this factor in making its decision.  Jesse asserts that this factor has no applicability in this case because the relocation request was not a custody dispute, where the parental fitness factor is a vital component.  Jesse argues that in making its determination as to this factor, the circuit court focused on past events that had been adjudicated in the divorce trial rather than assessing the present situation — whether it was in the children's best interest to relocate to California.

[¶23.]      The parental fitness factor requires circuit courts to consider "[w]hich parent is better equipped to provide for the child's temporal, mental and moral welfare[.]" *Fuerstenberg*, 1999 S.D. 35, ¶ 24, 591 N.W.2d at 807.  A circuit court may consider the following subfactors when evaluating parental fitness:

> (1) mental and physical health; (2) capacity and disposition to provide the child with protection, food, clothing, medical care, and other basic needs; (3) ability to give the child love, affection, guidance, education and to impart the family's religion or creed; (4) willingness to maturely encourage and provide frequent and meaningful contact between the child and the other parent; (5) commitment to prepare the child for responsible adulthood, as well as to insure that the child experiences a fulfilling childhood; and (6) exemplary modeling so that the child witnesses firsthand what it means to be a good parent, a loving spouse, and a responsible citizen.

*Schieffer*, 2013 S.D. 11, ¶ 17, 826 N.W.2d at 634 (quoting *Kreps*, 2010 S.D. 12, ¶ 26, 778 N.W.2d at 843-44).

[¶24.]     Parental fitness is an important and relevant factor in this case.[3] The circuit court noted that Jesse was not a fit parent prior to the divorce and that, while Jesse had worked to improve his parenting skills and relationships with the children since the divorce, he still "must show a longer history of appropriate behaviors in light of his past before the court would conclude that he is a fit parent." In comparison, the circuit court determined that Elizabeth was a fit parent and had provided stability for the children since birth. And, Elizabeth had sole legal and physical custody of the children. Accordingly, the circuit court properly considered the parties' fitness in making its relocation determination.

*Stability*

[¶25.]     Jesse contends that the circuit court fundamentally erred in its assessment of the stability factor. He argues that the circuit court minimized evidence that the children would be harmed in the proposed relocation and failed to adequately consider the current stable, living situation. Jesse asserts that the circuit court erred in relying on language from an "outlier" case "in this Court's relocation jurisprudence[,]" *Fortin v. Fortin*, 500 N.W.2d 229 (S.D. 1993), "to

---

3.     This Court has previously acknowledged a circuit court's consideration of the parental fitness factor in determining whether it would be in a child's best interests to relocate with a custodial parent. *Hogen,* 2008 S.D. 96, ¶¶ 5, 15, 757 N.W.2d at 162-63, 165. In *Hogen v. Pifer*, the parties shared joint legal custody with the mother having primary physical custody. *Id.* ¶ 2, 757 N.W.2d at 162. In denying the mother's request to relocate with child to Illinois from Vermillion, the circuit court observed that it could not "'say anything negative about either parent,' and found that 'it's very clear both parties are fit.'" *Id.* ¶¶ 5, 8, 757 N.W.2d at 163. We affirmed the denial of the relocation request based on the circuit court's 73 findings of fact and 14 conclusions of law, which reflected a balanced consideration of all relevant factors, including parental fitness. *Id.* ¶¶ 12, 15, 757 N.W.2d at 164-65.

emphasize the freedom of the 'family unit' over and above the children's needs to maintain stability and continuity." Additionally, Jesse argues that the circuit court ignored Elizabeth's failure to provide medical evidence of the children's ability to endure the move to California.

[¶26.]     The stability factor is an analysis of "[w]ho can provide a stable and consistent home environment[.]" *Fuerstenberg*, 1999 S.D. 35, ¶ 26, 591 N.W.2d at 808. In evaluating stability, a circuit court may consider the following subfactors:

> (1) the relationship and interaction of the child with the parents, step-parents, siblings and extended families; (2) the child's adjustment to home, school and community; (3) the parent with whom the child has formed a closer attachment, as attachment between parent and child is an important developmental phenomena and breaking a healthy attachment can cause detriment; and (4) continuity, because when a child has been in one custodial setting for a long time pursuant to court order or by agreement, a court ought to be reluctant to make a change if only a theoretical or slight advantage for the child might be gained.

*Schieffer*, 2013 S.D. 11, ¶ 17, 826 N.W.2d at 634 (quoting *Price v. Price*, 2000 S.D. 64, ¶ 27, 611 N.W.2d 425, 432).

[¶27.]     The circuit court found that it was clearly advantageous for Jonnathan, Elizabeth, and the children to live together in the same household rather than be separated by thousands of miles. In support of this finding, the circuit court noted specific language from this Court's decision in *Fortin*. *See* 500 N.W.2d at 232. Specifically, the Court in *Fortin* observed that "divorce by its very nature creates different family units with different dynamics among the original family members." *Id.* (holding that the circuit court abused its discretion because it "prohibited custodial mother from moving with her son to Ohio for the sole reason

that the move would disrupt the noncustodial father's visitation" with the son). This Court also noted that "what is advantageous to that unit as a whole, to each of its members individually and to the way they relate to each other and function together is obviously in the best interests of the children." *Id.* (quoting *D'Onofrio v. D'Onofrio*, 365 A.2d 27, 29-30 (N.J. Super. Ct. App. Div. 1976)).

[¶28.]    We disagree with Jesse's characterization of *Fortin* as an outlier in our relocation jurisprudence.[4] He contends that the circuit court used *Fortin* to emphasize the newly-created family unit over stability and continuity. The family unit may be one factor, among others, that circuit courts consider in deciding whether relocation is in the best interests of the child. *See Zepeda,* 2001 S.D. 101, ¶ 15, 632 N.W.2d at 54 (favoring a balanced consideration of multiple factors in custody decisions). Indeed, in *Fortin*, the Court acknowledged the presence of several factors in reversing the circuit court's denial of the mother's relocation request. 500 N.W.2d at 233 (noting that the record reflected that the mother was the child's primary caretaker; that both parents were loving parents; that the mother fostered father's visitation with the son; and the desire for the mother's relocation was motivated by the mother's impending marriage, which offered financial security).

---

4.    Jesse relies upon *Hogen* to support his assertion that *Fortin* is an outlier in our Court's relocation jurisprudence. The Court in *Hogen*, however, does not diminish *Fortin*'s authority, but instead, compares the circuit court's sole reason for denying relocation in *Fortin* to the 73 findings of fact and 14 conclusions of law entered by the circuit court in *Hogen* to support the denial of the request for relocation. 2008 S.D. 96, ¶ 12, 757 N.W.2d at 164.

[¶29.]        In the present case, the circuit court considered the family unit as one factor, among several others, in making its balanced and methodical relocation determination.  While the circuit court found that it was clearly advantageous for Jonnathan, Elizabeth, and the children to live together in the same household, the circuit court also found that Elizabeth was the children's primary caretaker, that Elizabeth was a fit parent who had provided stability to the children in the past and will continue to provide stability in California, and that Jonnathan's employment in California would provide financially for the family.  The circuit court noted that J.J.B. and J.E.B. had a close relationship with Jonnathan and he with the children.  It is clear from these findings that the circuit court considered all of the relevant factors and made a balanced decision.

[¶30.]        Additionally, the circuit court adequately considered the children's ability to tolerate the move to California to support its relocation determination.  While Jesse asserts that "Elizabeth presented no evidence from any . . . medical provider as to how the children" might tolerate the move to California,[5] we have

---

5.    At the hearing, Jesse's trial counsel conceded that there was no case-law requirement that a circuit court must consider medical evidence in its relocation analysis:

> **The court:** Mr. Nichols, yesterday you had made a comment to the court that you believed that there was case law — as I recall it, case-law authority discussing medical evidence.  What case-law authority did you have for that?

> **Mr. Nichols:** The case I was referring to, again, was *Hogen v. Pifer*, and perhaps after reading the case — I don't know that it's a requirement that the court actually consider medical evidence, but in this particular case, as was the case in *Hogen*, where you have [J.J.B.], who is a child who has significant clinical history, and even the testimony of the mother noting that he is not resilient to change and needs some stability, that

(continued . . .)

never required the presentation of medical evidence for a circuit court's consideration in a relocation analysis.[6] In making its determination, the circuit court considered Elizabeth's testimony identifying a school, church, physician, and dentist that would provide for the well-being of the children in California. And the circuit court was satisfied from the evidence that J.J.B.'s ADHD was sufficiently stabilized in order to make the move to California and that Elizabeth would provide the necessary structure to ensure that J.J.B.'s ADHD would remain stable. The circuit court also found Jesse's concern about J.J.B.'s medical condition and the need for stability to lack credibility in light of the fact that Jesse opposed J.J.B.'s diagnosis and treatment for his ADHD throughout the litigation. We defer to the circuit court's ability to judge Jesse's credibility and to weigh his testimony accordingly. Thus, the circuit court did not err in its assessment of evidence regarding the stability factor.

_____

(. . . continued)

based on the analysis done by Dr. Clayborne as to whether the children could tolerate this move, that that is something that they would need to present to this court as well. Not so much just from case law, but from a medical standpoint that a court — before you could engage in a decision where he would be uprooted from one community and sent to another, we need to know if he can tolerate it. Where is the medical evidence of that? Because what if he can't and there's a problem down the road? Then what?

So I think, with . . . [J.J.B.'s] medical history, that there needs to be some tactile medical evidence in the form of an opinion for this court before you can allow him to comfortably move to California.

6.     In *Hogen*, the parties retained an expert to conduct an evaluation of the mother's request to relocate with the child. 2008 S.D. 96, ¶ 4, 757 N.W.2d at 162. We, however, did not require in *Hogen*, or any other relocation case, that such evidence be presented to the circuit court for its consideration.

*Jonnathan's Past Conduct*

[¶31.]     Jesse asserts that the circuit court gave insufficient weight to Jonnathan's past conduct when it evaluated whether the relocation was in the best interests of the children.  To support his argument, Jesse points to evidence of the unstable relationship between Jonnathan and Elizabeth; Jonnathan's past work history; his history of two marriages and two divorces; Jonnathan's failure to stay current on child support payments for his own child; Jonnathan's decision to terminate parental rights to two of his three children; and Jonnathan's past criminal conduct.[7]

[¶32.]     The circuit court did not minimize this evidence in making its determination that relocation was in the best interests of the children.  In its decision, the circuit court acknowledged Jonnathan's past criminal history and determined that "there [was] no evidence that more than one alleged incident occurred with [Jonnathan's stepdaughter], or that [Jonnathan] ha[d] ever done anything inappropriate with any other child, including [J.J.B.] and [J.E.B.]"  The court noted that Jonnathan's second wife and stepdaughter continued to reside with

---

7.     The circuit court noted that in September 2009, Jonnathan pleaded guilty to conspiracy to commit coercion, a misdemeanor.  The conviction stems from an incident that occurred in Nevada when Jonnathan was living with his second wife, their son, and his second wife's minor daughter (stepdaughter).  Stepdaughter alleged that when her mother was not at home, Jonnathan got into bed with stepdaughter and inappropriately touched her.  Jonnathan testified that stepdaughter made the allegation to keep him from repairing the relationship between Jonnathan and stepdaughter's mother.

Additionally, on cross-examination, Jonnathan admitted to drinking with underage students when he was a teacher in Martin, South Dakota.  When asked about a sexual relationship with a student while he was a teacher in Martin, Jonnathan asserted his Fifth Amendment right.

Jonnathan after the criminal incident and that stepdaughter had recently contacted Jonnathan through social media, "thereby indicating that these allegations were not of significant concern to the persons directly involved." The circuit court remarked that "Elizabeth's knowledge of these allegations, as well as her past experiences with Jesse and the counseling she undertook thereafter, will result in her having extra-vigilance if any warning signs arise in [Jonnathan's] dealings with [J.J.B.] and [J.E.B.]"

[¶33.] The circuit court also considered Jonnathan's employment and his ability to provide for Elizabeth and the children in California. The court held a second hearing concerning Jonnathan's employment in California and the economic advantage that his employment would bring to the family. From that hearing, the circuit court found that Jonnathan had been receiving the guaranteed income that he testified he would earn. In addition, the circuit court had the opportunity to judge Jonnathan's credibility and weigh his testimony when considering all of the relevant factors in its decision, and thus, we defer to the circuit court on the issue of Jonnathan's credibility as a witness.

*Visitation*

[¶34.] Jesse argues that Elizabeth's proposed parenting plan provided Jesse with significantly less visitation than the divorce decree required.[8] Elizabeth's proposed parenting plan would offer Jesse 110 days each year with the children. The circuit court considered Jesse's arguments and noted that "Jesse's testimony

---

8. Elizabeth claimed that the proposed parenting plan provided Jesse with six more days of visitation than Jesse was awarded in the divorce decree.

was vague as to how he calculated [his visitation], but he claimed that he now spends 121-122 days with the children." Upon review, we cannot decipher how Jesse calculated the number of days of visitation nor does Jesse offer any clear explanation as to how he would receive fewer visitation days with the children if this Court were to affirm the circuit court's relocation determination. Thus, we do not find error in the circuit court's calculation of Jesse's visitation.

[¶35.]     In its 20-page, single-spaced memorandum and subsequent findings of fact and conclusions of law applying the relevant factors, the circuit court made a balanced and methodical decision. Thus, the circuit court did not abuse its discretion in determining that relocation was in the best interests of the children.

[¶36.]     **III.    Whether the circuit court erred in ordering Jesse to pay Elizabeth's attorney fees arising from Elizabeth's relocation motion.**

[¶37.]     Jesse argues that the circuit court erred in ordering Jesse to pay Elizabeth's attorney fees arising from Elizabeth's relocation motion. Jesse contends that the statute relied upon by the circuit court in ordering such fees, SDCL 15-17-38, does not contemplate an award of attorney fees in favor of a custodial parent who seeks to relocate. Jesse asserts that the premise of the motion was not a custody dispute in which Jesse sought relief, but rather he was exercising a statutory right to contest the proposed relocation.

[¶38.]     SDCL 15-17-38 provides in pertinent part: "The court, if appropriate, in the interests of justice, may award payment of attorneys' fees in all cases of divorce, annulment of marriage, determination of paternity, custody, visitation, separate maintenance, support, or alimony." Cases involving relocation of a child

are necessarily disputes regarding custody and visitation. Here, the dispute centered on the requested relocation motion as well as the effect that such relocation would have on Jesse's visitation with the children. Thus, it was appropriate for the circuit court to consider Elizabeth's request for attorney fees arising from her relocation motion under SDCL 15-17-38.

[¶39.]     Additionally, the circuit court did not abuse its discretion in awarding Elizabeth $3,500 in attorney fees related to her relocation motion. The circuit court outlined the relevant factors as set forth in *Driscoll v. Driscoll*, 1997 S.D. 113, 568 N.W.2d 771, in determining whether to award attorney fees. The circuit court first determines whether the fee is reasonable. *Driscoll*, 1997 S.D. 113, ¶ 22, 568 N.W.2d at 775. The circuit court then considers:

> (1) the amount and value of the property involved; (2) the intricacy and importance of the litigation; (3) the labor and time involved; (4) the skill required to draft pleadings and try the case; (5) the discovery procedures utilized; (6) the existence of complicated legal problems; (7) the time required; (8) whether briefs were required; and (9) whether an appeal to this [C]ourt is involved.

*Id.* (quoting *Kappenman v. Kappenman*, 522 N.W.2d 199, 204 (S.D. 1994)). The circuit court may then consider "the property owned by each party; their relative incomes; whether the requesting party's property is in fixed or liquid assets; and whether either party unreasonably increased the time spent on the case." *Id.* (quoting *Hogie v. Hogie*, 527 N.W.2d 915, 922 (S.D. 1995)).

[¶40.]     The circuit court analyzed the relevant factors in awarding Elizabeth $3,500 in attorney fees. In considering these factors, the circuit court found that the hourly rate and time spent by Elizabeth's counsel was reasonable, the litigation was

important, there was a considerable amount of time and labor involved, and the case involved the presentation of many hours of testimony and evidence. The circuit court also determined that neither party unreasonably increased the time that was spent on the case and that it was reasonable for Jesse to resist the requested relocation and for Elizabeth to pursue her motion. The circuit court examined the parties' known economic information and determined, based on credible evidence presented at the hearing, that Jesse made substantially more income than Elizabeth. Therefore, based on the circuit court's analysis of the applicable factors, we hold that the circuit court did not abuse its discretion in awarding Elizabeth $3,500 in attorney fees.

## *Appellate Attorney Fees*

[¶41.]    Jesse and Elizabeth submitted motions for appellate attorney fees to this Court. Pursuant to SDCL 15-26A-87.3, these motions were accompanied by verified, itemized statements of costs incurred.[9] Elizabeth originally requested that

---

9.    At oral argument, Jesse's counsel argued that appellate attorney fees should not be awarded to Elizabeth's counsel because Elizabeth's counsel did not submit a verified, itemized statement pursuant to SDCL 15-26A-87.3(1). Here, both parties filed motions for appellate attorney fees. Attached to Jesse's motion is a document captioned "Verified, Itemized Statement of Legal Services Rendered." At the conclusion of this document there is a separate section titled "Verification," where Jesse's counsel "duly sworn, deposes and says" that the instrument and its contents are true. The document is also notarized. By contrast, Elizabeth's motion was attached to two documents: (1) a notarized affidavit specifying that the affiant was duly sworn and deposed, and (2) an itemized statement of legal services rendered.

This Court has previously said:
> The concept of verification has a special meaning in the law. The first definition assigned to the word "verify" by Black's Law Dictionary is "to confirm or substantiate by oath or affidavit."

(continued . . .)

she be awarded $5,635.77 in appellate attorney fees and costs. Elizabeth then submitted a supplemental motion regarding additional anticipated appellate attorney fees and costs and an affidavit from Elizabeth's counsel was attached to the motion. In the affidavit, we note that Elizabeth's counsel stated that she "anticipates" that attorney fees and costs associated with oral argument will be an additional $3,356.82. Elizabeth now requests appellate attorney fees and costs totaling $8,992.59.

[¶42.] "Attorney fees are allowable in domestic relation cases, considering the property owned by each party, the relative incomes, the liquidity of the assets and whether either party unreasonably increased the time spent on the case." *Roth v. Haag*, 2013 S.D. 48, ¶ 21, 834 N.W.2d 337, 342 (quoting *Hogen*, 2008 S.D. 96, ¶ 16, 757 N.W.2d at 165). "We also examine the fee request from the perspective of whether the party's appellate arguments carried any merit." *Id.* We may award appellate attorney fees based on "a verified, itemized statement of legal services *rendered*[,]" not on anticipated fees. SDCL 15-26A-87.3. Accordingly, we grant

---

(. . . continued)

> Thus, a "verification" is a "confirmation of correctness, truth, or authenticity, by affidavit, oath, or deposition; or an affidavit of the truth of the matter stated . . . the object of verification is to assure good faith in averments or statements of parties."

*In Petition for Writ of Certiorari as to the Determination of Election*, 2002 S.D. 85, ¶ 8, 649 N.W.2d 581, 584 (internal citations omitted). "Verified means supported by an affidavit as to the truth of the matters set forth." 2A C.J.S. *Affidavits* § 2. "In other words, it is a sworn statement of the truth of facts stated in the instrument verified and always involves the administration of an oath." *Id.* Accordingly, an itemized statement of legal services rendered that is supported by affidavit constitutes a "verified, itemized statement" under SDCL 15-26A-87.3(1).

Elizabeth $5,000 for appellate attorney fees and costs incurred and deny Jesse's request for appellate attorney fees.

## CONCLUSION

[¶43.]     The circuit court did not abuse its discretion in its evidentiary rulings, or in determining that relocation was in the best interests of the children.  In addition, the circuit court did not abuse its discretion in awarding Elizabeth $3,500 in attorney fees.  We grant Elizabeth $5,000 for appellate attorney fees and costs.

[¶44.]     Affirmed.

[¶45.]     GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and SEVERSON, Justices, concur.